Timothy J. ODDSEN, Plaintiff-Respondent-Petitioner,

v.

BOARD OF FIRE & POLICE COMMISSIONERS FOR the CITY
OF MILWAUKEE,
Defendant-Appellant. [Case No. 80–1726.]

IN the MATTER OF the APPEAL OF Timothy J. ODDSEN;
Timothy J. ODDSEN, Petitioner-Respondent-Petitioner,

v.

BOARD OF FIRE & POLICE COMMISSIONERS FOR the
CITY OF MILWAUKEE,
Defendant-Appellant. [Case No. 80–1726.]

Gail A. QUADE, Plaintiff-Appellant-Petitioner,

v.

BOARD OF FIRE & POLICE COMMISSIONERS OF the
CITY OF MILWAUKEE,
Defendant-Respondent. [Case No. 81–684.]

STATE EX REL. Gail QUADE, Petitioner-Appellant-
Petitioner,

v.

BOARD OF FIRE & POLICE COMMISSIONERS OF the CITY OF
MILWAUKEE, Respondent. [Case No. 81–684.]

Supreme Court

*Nos. 80–1726, 81–684. Argued June 2, 1982.—Decided July 2, 1982.*

(Also reported in 321 N.W.2d 161.)

For the plaintiff-petitioner there were briefs by *Bruce B. Jacobson* and *Piano, Duffy & Jacobson,* attorneys, of Milwaukee, and *Charles J. Rainey,* of River Hills, of counsel, and oral argument by *Bruce B. Jacobson.* [Case No. 80–1726.]

For the defendant-appellant the cause was argued by *Rudolph M. Konrad,* assistant city attorney, with whom on the brief was *James B. Brennan,* city attorney. [Case No. 80–1726.]

For the plaintiff-petitioner there were briefs by *Kenneth J. Murray, Richard D. Moake* and *Murray & Moake, S.C.,* attorneys, of Milwaukee, and *Laurie Eggert,* of Madison, of counsel, and oral argument by *Laurie Eggert* and *Kenneth J. Murray.* [Case No. 81–684.]

For the defendant-respondent the cause was argued by *Rudolph M. Konrad,* assistant city attorney, with whom on the brief was *James B. Brennan,* city attorney. [Case No. 81–684.]

HEFFERNAN, J. We review two separate decisions of the court of appeals. Because the cases arose out of the same incident, present substantially the same questions of law and fact, and by direction of this court were argued on the same day, we consider it appropriate to consider the review of the decisions of the court of appeals in a single opinion.

Both cases involve discharges of police officers of the city of Milwaukee. In each case, after interrogation in the police headquarters, the two police officers, Gail A. Quade, a female officer, and Timothy J. Oddsen, a male officer, confessed to sexual intercourse, each with the other, on three separate occasions. Following the interrogation, Chief Harold Breier of the Milwaukee Police Department directed the discharge of each of the officers, and pursuant to sec. 62.50(13), Stats., he filed a complaint with the Board of Fire and Police Commissioners setting forth the reasons for the discharge. In his notice to the board, he specifically stated that Gail Quade and Timothy J. Oddsen had failed to conform to the adultery statute, sec. 944.16, Stats.

Pursuant to the statutes, Gail A. Quade and Timothy J. Oddsen took separate appeals. The board conducted separate hearings and affirmed the chief's action in respect to each of the officers and directed their discharge. Appeal was then taken separately by each of the police officers to the circuit court for Milwaukee county.

In respect to Gail A. Quade, the circuit court for Milwaukee county, WILLIAM A. JENNARO, Circuit Judge, affirmed the order of the Board of Fire and Police Commissioners by an order dated January 8, 1981. The court of appeals by unpublished opinion dated December 23, 1981, affirmed the order of the circuit court approving the discharge.

Oddsen also took an appeal from the order of the Board of Fire and Police Commissioners. Oddsen's case was

heard in the circuit court for Milwaukee county, JOHN E. McCORMICK, Circuit Judge. That court on September 15, 1980, reversed the order of the Board of Fire and Police Commissioners. Appeal was taken by the board to the court of appeals. The court of appeals, by unpublished opinion dated June 23, 1981, reversed the circuit court and reinstated the discharge order of the Milwaukee Board of Fire and Police Commissioners.

In respect to each of these cases we accepted review on petition of the police officers. We review the decisions of the court of appeals; and in each case, we reverse the court of appeals and direct the reinstatement of each of the police officers without prejudice and without loss of entitlement to pay for the period since discharge. The causes are remanded to the respective circuit courts for the purpose of calculating the pay to which each of the officers is now entitled, after making a determination of what earned income each of the officers has accrued during the period of suspension, which income, if any, shall be an offset against the liability of the city for the pay the officers would otherwise have accrued during the period that runs from the date of their discharge, April 11, 1978, to the date of reinstatement.

Numerous issues are posed in each of these cases. We find it unnecessary, however, to resolve all the issues, because we find controlling in each case the same dispositive issue—that the confessions extracted from Quade and Oddsen, as a matter of fact and law, were coerced, involuntary, the result of denial of due process, and contrary to fundamental principles of decency and fair play. Because we set aside each of these confessions in their entirety, there is no evidence whatsoever to support the decision of the board; and, accordingly, we need not decide whether the board, in making its decision on the basis of the preponderance of the evidence, rather than upon the basis of clear and convincing evidence, com-

mitted error in determining misconduct when the underlying conduct was alleged to be criminal. Here, there was no evidence in respect to the guilt of either Quade or Oddsen in the posture in which the Board of Fire and Police Commissioners decided the two cases other than that contained in the coerced confessions. It should be noted that no charge was filed in respect to any conduct at Officer Quade's house on March 22, 1978. All the charges stemmed from information revealed in the coerced confessions.

We recount the facts as revealed by the record. Gail A. Quade was a woman police officer and, at the time of her discharge, had been an officer for approximately two and one-half years. She was twenty-three years of age. Timothy J. Oddsen had been with the force for approximately nine years. From the record it appears that each of them worked out of the same district headquarters, and on occasion Quade was assigned to duty with Oddsen. Officer Oddsen was single. Officer Quade was married to Richard Quade. The record indicates that the Quades were estranged. A divorce was contemplated, but the actual departure of Richard Quade from the couple's home had occurred only a day or two before the March 21–22 incident.

On March 21, 1978, after Officer Quade completed the work of her shift at approximately 12 midnight, she invited several off-duty police officers to a party at her home. Oddsen was not invited by Quade, but was called by a fellow police officer and arrived later. By 5:30 a.m., all except Oddsen and Gail Quade had left the home. Those two had breakfast in the early morning hours. According to the police records, Richard Quade, Gail's estranged husband, stopped at the house to see whether Gail needed anything. He said that he found Oddsen and Gail in bed. Richard Quade, who was not a police officer, went to the phone and called police headquarters and

used the code meaning "an officer needs assistance." The response must have exceeded Richard Quade's wildest expectations, for within minutes 10 squad cars and at least 20 officers were at the Quade home.[1] At the time the squad cars arrived, both Oddsen and Gail Quade were fully dressed.

Shortly thereafter, at approximately 8 o'clock, Oddsen and Gail Quade were taken to the headquarters of the Fifth District, and each was separately interrogated by more senior officers. About the time the police arrived at the Quade home, Gail Quade became ill and vomited blood. She called her doctor and told him of her condition and made an appointment for that morning at 10 a.m.

Upon arrival at District Station 5, she was questioned about her off-duty conduct. Although she told the sergeants who were interrogating her that she had made an appointment with her own doctor, and although they knew that she was complaining about vomiting blood, she was not allowed to leave in order to keep the appointment with her own physician. She was instructed to submit to the investigation or be subject to further

---

[1] During the hearing it appeared that the police witnesses gauged the enormity of the accused officers' offense by the response of the police department as a result of Richard Quade's misuse of a police department code. The fact that many officers and a large amount of equipment of the Milwaukee Police Department were diverted from useful duties can hardly be blamed on either Gail Quade or Oddsen. It may well be that the police department felt impelled, because of the publicity that ensued as the result of Richard Quade's call, to bring charges. The public relations aspect of these proceedings is apparent in the board hearings. *E.g.*, although it was acknowledged that Oddsen was an outstanding officer, the board concluded that his usefulness was impaired because of "media" attention. Also, Gail Quade was judged, not solely on her conduct, but because it appeared to the board that her conduct cast discredit upon their attempts to have more women on the force. In respect to both officers, blame was assessed for reasons extraneous to the conduct.

charges. It is undisputed that she knew that her failure to answer questions could result in her discharge.

At about 10 a.m. she gave a statement in which she admitted no wrongdoing. Under the scrutiny of her interrogators, she called her doctor again, telling him that she could not leave the police station, and a new appointment was made for 2:15 p.m.

There is evidence in the record adduced at the hearing before the Board of Fire and Police Commissioners that indicates that, following her first statement, one of the interrogating officers tore up some of the sheets of Gail Quade's statement which he thought were false and kept those he considered useful. He indicated to her that she would stay there until she gave the information which the interrogators thought to be truthful.

At around 10 a.m., Quade again vomited blood, and she reported this to Sergeant Parys. At about 2 p.m., Quade was taken to the First District Central Police Headquarters; and there, apparently, Lieutenant Starke took charge of the interrogation. He was told by either Sgt. Parys or Sgt. Eccher that Quade was spitting up blood. Quade told Starke that she had an appointment with her physician at 2:15 p.m., but when she asked Lt. Starke for permission to see her own physician, he said, "We're not through with you yet. When we're done, you can go." Lt. Starke, however, allowed Quade to call her doctor. Her conversations with her physician were always made in the presence of one or more of the interrogating police officers. She told her physician that she had continued to vomit blood, had very severe stomach pains, and was very nervous and upset. Her doctor then said he would see her later in the afternoon if she at that time would be able to leave the police headquarters. At or about the time of this phone call, Lt. Starke told Quade that, if she wanted to go to a hospital or see a doctor, he would stop the interrogation. He said at the hearing before the Board of Fire and Police Commissioners that he was

very conscious of her physical condition. Quade told Starke that she wished to see her own doctor. It was very clear from the testimony that, at no time, did Lt. Starke acquiesce in Quade's request to see her personal physician, who was familiar with her condition. He merely said that she could go to *a* hospital or see *a* doctor. He stated that she could see her own doctor when the police were finished with her.

Quade testified that she vomited during the afternoon, and she said that she had severe stomach pain during the entire period of questioning.

At 5:45 p.m., after approximately ten hours of questioning, Quade gave a statement in which she admitted to having intercourse with Police Officer Oddsen while off duty. During the course of the taking of a verbatim statement at about 5:45 or 6 o'clock, Quade denied having intercourse with Oddsen that morning. She did admit, however, to having intercourse on three earlier dates. Lt. Starke asked such "narrow" job-related questions during the course of this interview as, "During any of these affairs, did Oddsen use protection," "Did you have any contraceptives or a pill," and "Could there have been a possibility of your becoming pregnant."[2]

After being questioned for twelve hours, Quade was allowed to leave shortly after 7 p.m. While she was on her way home, being driven by police sergeants, they were ordered to return her to the central police administration offices. She was returned for a purpose that is not made clear in the record nor was it made clear to her. She was finally permitted to return home after fourteen hours of custody and confinement.

Accordingly, the statements which the police officers extracted from Quade were the result of approximately

[2] The right to interrogate a police officer is limited to "questions specifically, directly, and narrowly relating to the performance of his official duties . . . within the scope of the specific duties . . . ." *Spevack v. Klein,* 385 U.S. 511, 519 (1967), Fortas concurring.

fourteen hours of interrogation, during which time Quade complained of severe stomach pains and the vomiting of blood. During the interrogation she was permitted to call her doctor four times to make appointments to see him; but each time, when the time for the appointment came, she was told by the interrogators that she could not see her doctor until they were finished with her. Officer Quade knew that her failure to respond to the questions could result in her discharge; and when she wrote her initial statement, she was told she would have to write another report—a report which would conform to what the police officers believed to be the truth—unless she wished to be subjected to additional discipline.

At the time Oddsen and Quade were brought to police headquarters, Oddsen asked for a lawyer or a representative of the policemen's union to be present during the interrogation. In Quade's hearing before the Board of Fire and Police Commissioners, Oddsen stated this request was made not only for himself but also for Officer Quade. Officer Quade did not ask for a lawyer or a representative of the policemen's union until late in the afternoon, and that request was denied. Although it was made clear to Officer Quade that their interrogation focused upon adultery, at no time was she told of her fifth amendment rights against self-incrimination nor was she told that any statements she might give during an interrogation under the duress of possible job loss for failure to answer could not be used in a criminal proceeding.

Oddsen was brought to the police headquarters at the same time as Gail Quade. He immediately asked, as recounted above, for a lawyer or representative of the union. This request was denied.

Oddsen told the interrogating officers that he was extremely tired, that he had not slept for two nights, and it was his assertion near the end of the interrogation that he had not slept for forty-seven hours. Nevertheless, he was directed to write a report of the morning inci-

dent. At 9 a.m., Oddsen wrote a report which his interrogators believed to be untruthful, and he was told that he would be punished for filing an untruthful report. In the first statement given, he denied that he had ever had sexual intercourse with Officer Quade. After writing this initial report, Oddsen again requested representation, which was again denied. He was told that, if he left without satisfying his interrogators, he would face additional disciplinary action. Early in the afternoon, Oddsen was taken to the downtown police headquarters, where he was told by Lt. Starke he would have to give a statement. Again his request for counsel or representation was denied. Oddsen stated that he was physically and mentally exhausted and unable to answer any more questions. Nevertheless, he was directed to write additional statements.

At the hearing before the Board of Fire and Police Commissioners, Lt. Starke was asked about the conditions surrounding Oddsen's interrogation at central headquarters. He stated that Oddsen alleged that he had been without sleep for forty-seven hours, but he said he examined Oddsen closely and felt that he was coherent in his answers. He acknowledged that Oddsen, despite the request, was not allowed counsel, and he asserted that his purpose for interrogation was merely an employee investigatory matter and that, had a felony charge for adultery been contemplated, the interrogation would have been by the vice squad. He did say, however, that he was aware that a felony charge for adultery could result. He acknowledged that Oddsen was told that he would not be allowed to leave until he satisfactorily responded in a stenographically reported verbatim statement.

Oddsen contended that, during the period of time he was at the police headquarters, from approximately 8 in the morning to 8:45 at night, he was not offered any food, and the only thing he had to drink was a cup of coffee at about 10 a.m. During this period, during a re-

spite in his interrogation, he said he saw Gail Quade go into a washroom and heard her vomit. He stated that, before each statement was requested of him, he asked for counsel. He was denied the right to make any phone calls.

Lt. Starke testified before the board that, in fact, Oddsen was offered food. Oddsen told the commissioners, however, that he was offered food so late in the day that at that point he was not interested in food and could not have eaten.

The verbatim stenographically reported statement of Oddsen was given in response to Lt. Starke's questions at about 6 p.m. Officer Oddsen was asked about what happened that morning at the residence of Police Officer Gail Quade. Officer Oddsen responded by saying that he had not had any sleep for forty-eight hours and he would like someone present from the union to represent him, either one of the officers of the union or Attorney Kenneth Murray, the legal representative of the police officers union. He was told that the rules did not allow representation. Officer Oddsen stated that he knew that he was bound by the rules of his employment to answer questions put to him.

He denied having intercourse that morning with Officer Quade, but finally he did admit to having intercourse with her on three occasions, the first being on Christmas Eve of 1977. Two other instances of intercourse were acknowledged. With the same assiduity for probing into facts that narrowly and directly are within the scope of official duties of subordinate officers that he displayed in interrogation of Officer Quade, Lt. Starke asked Oddsen, "Any sodomy?"

Oddsen was released at about 8:45 p.m., after being questioned in excess of thirteen hours.

While the two police officers were being interrogated, an identification squad was sent to the Quade home in

an attempt to determine whether Oddsen's fingerprints could be found in the bedroom or bathroom. No fingerprint identification was made. However, a T-shirt was found in the bedroom, which Oddsen acknowledged was his. During the course of his interrogation, although denying intercourse with Gail Quade on that day, he admitted that, because of his fatigue, he had gone to bed wearing only his undershorts and socks and had slept only about fifteen minutes prior to the advent of the indignant Mr. Quade.

During the entire interrogation of Oddsen, it was clear that the investigation was centered on whether Oddsen and Quade had committed adultery. Oddsen, like Quade, knew, and in fact was told, that the failure to answer questions truthfully could result in being discharged from the police force. Oddsen, like Quade, knew that the commission of the sexual acts could result in criminal prosecution. During the course of these interrogations, neither of them was told that they had a right not to incriminate themselves, nor were they told that, were they to make a statement under the duress of the possibility of losing their jobs, they were afforded immunity from prosecution by operation of law.

The record at the hearing before the Board of Fire and Police Commissioners shows that, on the basis of the statements given by the accused officers, the police department attempted to have the district attorney's office commence prosecution for adultery against both Quade and Oddsen. This, the district attorney's office refused to do. During the course of the hearing before the board in respect to Oddsen, the deputy district attorney testified that adultery was not being prosecuted by the district attorney's office.

Following the taking of these statements from Oddsen and Quade, Chief Breier discharged both of them, and each took separate appeals to the Board of Fire and Police Commissioners. The complaint against Oddsen

by Chief Breier alleged that Oddsen violated department rules which require that:

"Members of the police force . . . shall conform to, abide by and enforce all the criminal laws of the State of Wisconsin and the ordinances of the City of Milwaukee of which the Department must take cognizance . . . ."

Because Officer Oddsen had engaged in intercourse with Gail Quade, Chief Breier alleged that the dismissal of Oddsen from the department was required.

The complaint against Quade was similar in that it alleged that Officer Quade engaged in sexual intercourse with Oddsen. In addition, it alleged that, on New Year's Eve, January 1, 1978, she had knowledge of an unauthorized party at the Police Academy and failed to notify her commanding officer. This, the chief of police alleged, subjected Gail Quade to discipline for disobedience of orders. This latter allegation on the face of Breier's complaint is insufficient, because there is not even an assertion that the alleged conduct was in violation of a rule or in violation of an order. The only allegation is that there was no authorization for the party. Moreover, the only proof in respect to Quade's knowledge of the New Year's Eve party or her conduct in respect thereto is contained in her statement given under duress.

Numerous issues were addressed in both appeals to the Board of Fire and Police Commissioners. The only evidence of misconduct before the board in respect to either Quade or Oddsen was derived from the statements taken during their interrogation on March 22. We conclude that all of the information thus adduced was involuntary, coerced, in violation of their constitutional rights of due process, and, accordingly, was untrustworthy and required to be excluded from the evidence.

It is, of course, the law that superiors in a police force may question a subordinate and ask:

". . . questions specifically, directly, and narrowly relating to the performance of his official duties as dis-

tinguished from his beliefs or other matters that are not within the scope of the specific duties . . . ." *Spevack v. Klein*, 385 U.S. 511, 519 (1967), Fortas concurring.

At the very outset, one who peruses the record is struck by the fact that the accused police officers here involved were off duty and, in fact, are referred to in the brief of the Board of Fire and Police Commissioners as "off-duty police officers." Moreover, the questioning that ensued was not confined narrowly, directly, and specifically to matters within the scope of the specific duties of the officers. Questions directed to whether the parties used contraception, whether pregnancy was likely to ensue, or how the sexual acts were performed are not the questions that can be asked by a public employer. Rather, under the circumstances here, they smack of the salacious inquisitiveness of a "nosey parker." We, however, do not base our conclusion that both cases must be thrown out on the ground that the police superiors invaded the constitutional rights of privacy of their subordinates. Rather, we conclude that the entire course of questioning of both officers was coercive as a matter of fact and as a matter of law and resulted in involuntary statements.

It is apparent that neither investigation was properly termed investigatory. They were accusatory. From the very beginning, it was apparent that the questioning police officers were directing their attention to Oddsen and Quade as likely suspects of adulterous conduct. Their purpose was not merely investigatory but was to sew up and confirm their preconceptions of guilt for punitive purposes, whether those purposes be criminal prosecution or the imposition of penalties under the rules of the police department.[3]

---

[3] As pointed out, *supra*, the chief of police in his notice of discharge sent to the Board of Fire and Police Commissioners referred to the conduct as adultery and cited the criminal law. Sec. 944.16, Stats.

In both cases, Officers Quade and Oddsen were denied counsel. In respect to Oddsen, the Board of Fire and Police Commissioners made a specific finding that there was a "conscientious" denial of counsel. No such finding was made in respect to Quade, but the evidence adduced at her hearing showed, at the very outset of the interrogation, Oddsen requested counsel for himself and for Quade. Also, it is undisputed that Quade requested counsel before her verbatim stenographic statement was elicited. If there were a constitutional right to counsel clearly spelled out, or a statutory right to counsel, the denial of counsel would end the controversy and result in a dismissal of the charges. Here, the city contends, there is no right to counsel. Conceding, *arguendo*, that may be true, that does not mean that the lack of counsel here did not contribute substantially to the totality of coercive circumstances.

We conclude that the failure to afford counsel was a coercive factor and contributed to the production of involuntary and coerced statements from both officers.[4]

Additionally, both of the police officers knew that they were obliged to answer questions or possibly forfeit the property rights in their employment. They were conveyed to the police station in a squad car and were under close supervision for the rest of the day. Both of them were in the coercive atmosphere of the police station. The coerciveness of these surroundings upon one who is not a police person has been recognized in *Miranda v.*

[4] The legislature has provided by sec. 164.02, Stats., effective in 1980, that, in cities of the first class, where there has been a request by a law enforcement officer for representation during interrogation and that request is denied, evidence obtained cannot be used in a subsequent disciplinary proceeding. While this statute was not in effect at the time of the interrogation of Quade and Oddsen, it reflects the rationale we use here—that the failure to provide representation during a coerced interrogation is a factor in the determination of involuntariness.

*Arizona,* 384 U.S. 436 (1966). The coercive character of those surroundings is perhaps even clearer to a police officer who is familiar with the techniques of police interrogation.

Both of the parties stated they were fatigued. Oddsen stated that he had not slept for forty-seven hours, although there is evidence that, during that period, he did have a short period of rest. Quade stated that she had not slept for twenty-four hours. Each of them gave one or more statements which the interrogators concluded were unsatisfactory, and it was made clear that neither would be released until they gave a statement which satisfied the interrogators' conception of what was the truth. Oddsen alleged he had no food during his approximately thirteen to fourteen hours of interrogation, and when he was offered food, it was so late in the day that he could not eat. Quade was there for a period of fourteen hours and was given no food, and the first statement that she gave was in part torn up by the interrogating sergeant; and there is substantial evidence in the record of the board which could lead a reasonable finder of facts to conclude that the portion of the first statement was pieced together with a portion of a later statement in order to present a narrative that was to the satisfaction of the interrogators.

In respect to Officer Oddsen, it is clear that the principal most coercive factor was his lack of sleep, to which he referred repeatedly.

During the course of interrogation, Officer Quade made four appointments to see her doctor. The time of each appointment was known to her interrogators. Yet, they refused to allow her to see her own doctor, who was familiar with her case. They did agree that they would take her to a hospital and have her seen by a doctor, but it was very clear that they were denying her medical attention from her own physician. Much is made by the city of the fact that, upon Lt. Starke's question, "Do you

wish medical attention at this time," Quade responded, "No, I'll wait." However, Quade had just stated that she was experiencing discomfort. Moreover, this statement was taken at 5:45 p.m., after approximately ten hours of questioning, and it was at a time when Officer Quade had finally given a preliminary statement that satisfied her inquisitors. She had already stated that she had indulged in sexual intercourse with Oddsen. The police had told her that when she finished her statement she would be released. It is rather obvious why at this point, with release imminent, she did not demand immediate medical attention. Cruelly enough, even after this statement was completed, she was kept in custody for approximately another three hours.

The right of due process, which is constitutionally protected, is not limited to criminal matters. Our constitution provides:

"No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const., Art. XIV, sec. 1.

Public employment is a property right. *Board of Regents v. Roth*, 408 U.S. 564 (1972). Evidence obtained by the denial of due process may not be used in the courts of this state.

In respect to Quade's case, where she was ill and in pain during the interrogation, the language of the United States Supreme Court in *Malinski v. New York*, 324 U.S. 401 (1945), is appropriate. There, the court, discussing the due process clause, stated that that amendment to the constitution:

". . . inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." At 416–17.

Clearly, the detention and interrogation of Police Officer Quade was offensive to canons of decency and fairness. It is shocking to the conscience of this court, and it is shocking and almost inconceivable that a police department would assume that it could maltreat its own employees in a manner which it knows would not be tolerated or approved by the courts, even were the object of the interrogation a person accused of a heinous crime. Due process, of course, is required, not merely for the protection of the unfortunate victim of coercive police tactics, but it is necessary to the integrity of the judicial process. Due process is violated by coerced confessions, because they are unreliable, and should not be allowed to contribute to a finding of guilt in a court of law which attempts to base its judgments on trustworthy and reliable evidence. Moreover, where the tactics used are offensive and outrage the public's sense of decency, it is society and society's standards of fundamental fairness that are offended. *See, Brown v. Mississippi*, 297 U.S. 278 (1936); *Spano v. New York*, 360 U.S. 315 (1959). As *Spano* stated:

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." At 320.

We find the coercive tactics used in respect to Oddsen only slightly less offensive than those used in respect to Officer Quade. We find them less offensive, not because he is a male officer and she is a female officer, but because, clearly, she was ill at the time and, irrespective of sex, was entitled to solicitude, which was not afforded her.

We find in respect to each of them that the circumstances of their interrogation, when considered in their totality, were coercive and rendered the statements unreliable, untrustworthy, and involuntary, and, above all, the products of the denial of due process. While in each case the Board of Fire and Police Commissioners purported to find the statements voluntary, an examination of the record makes it clear that the facts to the contrary are overwhelming. Giving full credence to the statements of the interrogators, it is apparent that the expressed attitude of the interrogating police officers and their conduct in light of the circumstances demonstrate beyond a reasonable doubt that the statements were of such a nature that to permit their use in the denial of a property right would contravene the constitutional protections of the fourteenth amendment.

Additionally, we conclude that both of these discharges must be set aside, because the statements were coerced and involuntary as a matter of law. It is apparently the contention of the board that, because high fidelity to duty is required of police officers, inquisitorial tactics may be employed to determine their fidelity to duty even though elementary constitutional rights which are afforded to other citizens are bypassed. If truth can only be obtained by the denial of rights, then our entire judicial system, which is based upon affording due process and a panoply of constitutional rights, is based upon a premise doomed to failure.

The argument is a familiar one—that a police officer may be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. *See, Spevack v. Klein,* 385 U.S. 511, 519 (1967) ; *Garrity v. New Jersey,* 385 U.S. 493 (1967). This is, of course, a correct statement of the law, but it is misapplied in the context of these cases. It has been recognized in *Garrity, supra,*

and numerous other cases that a public officer, a police officer, may be interrogated and his refusal to respond can result in a discharge for that very reason. *Garrity* pointed out, however, that, where the interrogation concerns a matter which is criminal, "The choice imposed on petitioners was one between self incrimination or job forfeiture." P. 496. *Garrity* pointed out that such coercion renders a statement taken in such circumstances as being "infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary . . . ." PP. 497–98.

It is clear that *Garrity,* quite aside from the use to which the statements or confessions are to be put, recognizes the inherent coercion in a situation where a police officer, on one hand, can be fired for not answering and, on the other hand, can be prosecuted if he answers and incriminates himself. *Garrity* went on to resolve the particular problem presented therein, where the coerced statement was sought to be used in a subsequent prosecution. It held that, where a police officer faces such a dilemma:

"[T]he protection . . . against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." P. 500.

The representatives of the City of Milwaukee in this case twist the meaning of *Garrity* by acknowledging that a statement taken under these circumstances cannot be used in a criminal case because it is coercively violative of the fifth amendment rights against self-incrimination, but they then jump to the startling conclusion that it is because it is excluded in a criminal prosecution that the coerced and involuntary confession can be used for other purposes. This is clearly incorrect. It is because the con-

fession is coerced and involuntary that it cannot be used for a criminal prosecution. The fact that it is not used and cannot be used in a criminal prosecution does not make it voluntary and trustworthy. As a matter of law, the coerced, involuntary confessions here extracted may not, under the circumstances, be used for any purpose.

Subsequent cases shed some light upon the scope and the meaning of *Garrity*. In *Confederation of Police v. Conlisk,* 489 F.2d 891 (7th Cir. 1973), the United States Court of Appeals considered a situation in which Chicago police officers were questioned in respect to certain allegations of criminal conspiracy and corruption. The police officers in that case were warned by the United States Attorney that anything they said could be used against them. They were also aware of the fact that they could be discharged if they did not make a statement. In each case the police officers, upon the advice of counsel, invoked the privilege and declined to answer. They were discharged as a result of their failure to respond. The circuit court of the Seventh Circuit analyzed the *Garrity* case, *supra, Spevack v. Klein, supra, Gardner v. Broderick,* 392 U.S. 273 (1968), and *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation,* 392 U.S. 280 (1968). The Seventh Circuit Court of Appeals held that the firing of the Chicago police officers in these circumstances was unconstitutional. The *Conlisk* case points out that, merely to relieve a police officer, after the fact, of the possibility of prosecution, does not solve the dilemma with which he is faced while undergoing interrogation. The exclusion of the statement in a criminal proceeding is nothing more than the exclusion of a coerced statement. In the first place, the employee may or may not know of his rights to remain silent and to avoid self-incrimination; and, even if he is aware of that right, he almost certainly does not know that, under *Garrity,* as a matter of law, his response cannot be used against him

in a criminal case. Thus, the philosophy of *Conlisk* is that the coercive power of job forfeiture should not be employed unless it is made clear that to speak will not result in criminal prosecution. The Seventh Circuit Court summarizes its analysis by stating:

"In sum, then, the *Gardner* and *Uniformed Sanitation Men* decisions indicate that a public employer may discharge an employee for refusal to answer where the employer both asks specific questions relating to the employee's official duties and advises the employee of the consequences of his choice, *i.e.*, that failure to answer will result in dismissal but that answers he gives and fruits thereof cannot be used against him in criminal proceedings." P. 894.

In the Seventh Circuit case, because the police officers were not informed that any information which they gave could not be used against them in criminal proceedings, their discharges were unconstitutional as a matter of law under the rationale of *Garrity, Gardner,* and *Uniformed Sanitation Men.*

In the instant case, it is clear that both Oddsen and Quade knew that they could be fired if they refused to answer the questions. It is equally clear that they were not told that, were they to speak, the statements they gave could not be used against them in a prosecution for adultery. Accordingly, the statements they gave were barred as a matter of law. Absent the advice that they could not be prosecuted on the basis of the statement given, their statement was the product of a coercive choice. They were truly between Scylla and Charybdis. If they did not speak, they knew that they would be fired. If they spoke, what they said could lead to prosecution, and most likely, in any event, to conviction and dismissal from their jobs. Absent the warning spelled out in *Conlisk,* these coerced statements cannot be used. There is no necessity for the police department or anyone else to be

given authority to grant immunity from criminal prosecution. Immunity is conferred by operation of law as determined by the United States Supreme Court in *Garrity*. If a statement is taken under these conditions, *i.e.,* a threat of job forfeiture, a defendant is given immunity from prosecution, at least to the extent that the statement could be the basis for the prosecution. Accordingly, in the instant case, in order to prevent the statement being excluded as a matter of law, where its purpose is discipline, it was incumbent upon the interrogating police officers to advise:

". . . the employee of the consequences of his choice, *i.e.,* that failure to answer will result in dismissal but that answers he gives and fruits thereof cannot be used against him in criminal proceedings." *Conlisk, supra* at 894.

McQuillin, 4 *Municipal Corporations,* sec. 12.242, pp. 292–93, states in accord:

"[A]n employee may be dismissed for refusal to answer where he has been asked specific questions relating to his official duties and has been advised that the answers he gives and the fruits thereof, cannot be used against him in criminal proceedings."

Because such admonitions were not given here, the statement is coercive and involuntary as a matter of law. It was a statement given under duress and compulsion with no opportunity to weigh the consequences of answering or not answering. Accordingly, even were the conduct of the police interrogators in this case not as gross and degrading as the record shows it to be, the statements must be excluded as a matter of law.

In the absence of these statements, there was no proof whatsoever that either Oddsen or Quade had indulged in the conduct alleged. Moreover, the additional charge

brought against Quade that she failed to report an unauthorized party at the Police Academy is also dependent upon her own statement and must be disregarded for the same reason. Independent corroboration was so tenuous as to be devoid of any probative value whatsoever.

Because we have decided each of these cases on what are basically due process grounds, which exclude the only proof put forward by the chief of police, we reverse and order the reinstatement of Officer Quade and Officer Oddsen pursuant to sec. 62.50(21), Stats., and remand to the circuit court for purposes of computing past due wages for each of these police officers.

Our focusing, however, on the due process deficiencies of the interrogation procedure does not mean that we validate or accept other contentions made by the city Board of Fire and Police Commissioners on this review. We have directed our attention solely to the question of proof, and we find there was none. Thus, we do not address ourselves to the quantum of proof required where the conduct used as a basis for disciplinary measures is also a crime. We have not addressed ourselves to that issue, because such determination would be moot in circumstances where there is no proof whatsoever.

*By the Court.*—Decisions reversed and the causes are remanded to the respective circuit courts, with directions that the officers be reinstated without prejudice as provided by the statutes and for the computation of wages due.