STATE of Wisconsin,
Plaintiff-Appellant,

v.

Vanessa BROCKDORF,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2004AP1519–CR. Oral argument October 12, 2005.
—Decided June 28, 2006.*

2006 WI 76

(Also reported in 717 N.W.2d 657.)

For the defendant-respondent-petitioner there were briefs by *Martin E. Kohler, Brian Kinstler,* and *Kohler & Hart, LLP,* Milwaukee, and oral argument by *Brian Kinstler.*

For the plaintiff-appellant the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Aaron Nisenson,* Alexandria, VA, and *Jonathan Cermele* and *Eggert & Cermele, S.C.,* Milwaukee, on behalf of the International Union of Police Associations, AFL-CIO.

An amicus curiae brief was filed by *Gordon E. McQuillen,* Madison, on behalf of the Wisconsin Professional Police Association/Law Enforcement Employee Relations Division.

¶ 1. JON P. WILCOX, J.   The defendant, Milwaukee Police Officer Vanessa Brockdorf (Brockdorf), seeks review of an unpublished decision of the court of appeals,[1] which reversed an order of the Milwaukee County Circuit Court, Frederick C. Rosa, Judge, suppressing a statement Brockdorf made to Detective

[1] *State v. Brockdorf,* No. 2004AP1519–CR, unpublished slip op. (Wis. Ct. App. Dec. 14, 2004).

Michele Harrison (Harrison) of the Internal Affairs Division (IAD) of the Milwaukee Police Department (MPD).

¶ 2. Brockdorf contends that the United States Supreme Court decision of *Garrity v. New Jersey,* 385 U.S. 493 (1967), requires the suppression of a police officer's incriminating statement given in an internal investigation when the officer has the subjective belief that she must answer questions in an internal investigation or lose her job and that belief is objectively reasonable.

¶ 3. Today, we adopt a two-pronged subjective/objective test for determining whether, as a matter of law, an officer's statements given in a criminal investigation are coerced and involuntary, and therefore subject to suppression under *Garrity.* Under this test, we examine the totality of the circumstances, but an express threat of job termination or a statute, regulation, rule, or policy in effect at the time of the questioning which provides for an officer's termination for failing to answer the questions posed, will be a sufficient circumstance to constitute coercion in almost any conceivable situation. Using this analysis, we conclude Brockdorf's incriminating statement was not unconstitutionally coerced under the Fifth Amendment, and *Garrity* immunity does not apply. As such, we affirm the decision of the court of appeals.

I

¶ 4. On December 15, 2003, the State filed a criminal complaint against Brockdorf and her then-partner Officer Charlie Jones, Jr. (Jones) alleging various charges related to an alleged beating of a shoplifting suspect on September 14, 2003, and the investigation

639

that followed. Specifically, Brockdorf was charged with obstructing Harrison by knowingly giving false information to her with the intent to mislead, contrary to Wis. Stat. § 946.41(1) (2003–04). Jones was charged with battery and two counts of obstructing an officer by providing false information.

¶ 5. On the evening of September 14, Brockdorf and Jones responded to a shoplifting complaint at a Kohl's Department Store on South 27th Street in Milwaukee. When the officers arrived at the store, they met with Kohl's loss prevention supervisor and the suspect, Gilberto Palacios (Palacios). While Brockdorf interviewed store personnel, Jones took Palacios outside, as Palacios was agitated and loud in the store. Palacios was placed in the squad car, and the officers drove to a nearby Noodles restaurant. Brockdorf went into the restaurant to place a takeout order. While she was inside ordering, several witnesses observed Jones take Palacios out of the squad car, repeatedly punch him in the head, and then place him back in the squad car. When Brockdorf returned, Jones was out of breath, and he told her that the suspect had tried to kick out the squad car windows and had ripped his shirt. The officers returned to Kohl's parking lot, at which time they called for a sergeant. The responding sergeant was told that the scuffle between Jones and Palacios had occurred at Kohl's. Brockdorf and Jones then transported Palacios to the hospital.

¶ 6. In response to a citizen's complaint about the incident at Noodles, the MPD initiated a criminal investigation. Harrison, an IAD detective who works solely in criminal investigations, first spoke with Brockdorf on September 19, 2003, at Brockdorf's home. At that time, Brockdorf stated that when she exited Kohl's, she noticed Palacios' shirt was ripped. Jones told her

that the shirt ripped while Palacios was knocking over mannequins in the store. The officers then called for a sergeant, who directed them to take Palacios to a hospital. Brockdorf stated that she then drove to Noodles, went inside to order food, and when she returned Jones told her that Palacios had tried to kick out the windows in the squad car. Brockdorf then proceeded on to the hospital.

¶ 7. On October 3, 2003, Harrison again spoke with Brockdorf at the Milwaukee Police Academy on Teutonia Avenue. Although the parties dispute the details of what occurred on that date, Brockdorf eventually changed her story, telling Harrison that she and Jones had gone to Noodles before the sergeant was called, and the alleged beating occurred at that location.

¶ 8. After the criminal complaint was filed, Brockdorf filed a motion to suppress the statement she gave on October 3.[2] She argued the statement was not voluntary under *Garrity*. The Milwaukee County Circuit Court, Frederick C. Rosa, Judge, presiding, held a hearing on April 2, 2004, at which both Brockdorf and Harrison appeared.

¶ 9. Brockdorf testified that when she arrived at work on October 3, a sergeant informed her that internal affairs wanted to meet with her. She reported immediately to the IAD office located on the third floor of the Police Academy and met with Harrison and Detective Ivan Wick (Wick) who wanted to "requestion [her] regarding the battery, regarding [her] partner." Brockdorf testified that she told them she did not want to talk without a union representative present. Further,

---

[2] Brockdorf concedes that she is unable to challenge her September 19, 2003, statement because it is untruthful. *See Herek v. Police & Fire Comm'n,* 226 Wis. 2d 504, 517, 595 N.W.2d 113 (Ct. App. 1999).

she testified that she sat for an hour before she said anything and that both detectives told her "[i]f you don't talk now, you're going to get charged with obstructing." Brockdorf said she did not want to get charged with obstructing, so she decided to answer the detectives' questions.

MR. KOHLER (COUNSEL FOR BROCKDORF): Did you feel as a police officer you had to answer their questions?

BROCKDORF: Yes. Because I would have been charged with obstructing if I didn't.

Q: Is that the only reason you answered their questions?

A: Yes.

Q: Did you think what would happen to you if you were charged with obstructing?

A: Well, they always say in the academy that you get fired for lying, that it's a grave disqualification.

. . . .

Q: Other than being charged, did you fear for your job at that point?

A: Yes, because I didn't—first I wasn't the target, and then all of a sudden I became the target of this investigation.

Q: What did you think was going to happen to you if you didn't talk to them, other than being charged with obstructing?

A: I figured I'd later be fired.

Q: So are those the two reasons why you consented to the interview?

A:  Yes.

¶ 10.  On cross-examination, Deputy District Attorney Jon N. Reddin asked Brockdorf the following:

MR. REDDIN:  Did either Officer Wick or Officer Harrison tell you that you'd be fired if you didn't talk to them?

BROCKDORF:  No, they just said I'd be charged with obstructing.

Brockdorf also indicated that she believed she would be charged with obstructing for not telling the truth. On redirect, Brockdorf then insisted that she believed she would be charged with obstructing if she did not answer the questions posed to her.

¶ 11.  Harrison described the events of October 3 differently. She testified that when she met with Brockdorf, she advised her about the nature of the investigation. That is, the detectives wanted to question her regarding the use of force complaint and that she was not the target of the investigation. Specifically, Harrison said that there were some inconsistencies in Brockdorf's statement and other facts discovered during the course of the investigation that made a second interview necessary, but Harrison did not believe Brockdorf had been untruthful prior to the interview. Harrison testified that she recalled Brockdorf asking if she should call for union representation; she told Brockdorf it was up to her to make that decision. Brockdorf did not call a union representative and subsequently gave a statement in which she essentially admitted her first statement was untrue. Harrison further stated that she never told Brockdorf that she would be terminated or charged with obstructing for refusing to give a statement. Indeed, Harrison testified

that she advises everyone she talks to that they may choose not to answer any of the questions asked of them. Finally, she conceded that Brockdorf was not offered *Garrity* immunity, nor had she ever heard of such a concept.

¶ 12. The circuit court granted the suppression motion in a written decision issued April 21, 2004. The court concluded that when looking at the totality of the circumstances, Brockdorf's subjective fear that her job was on the line was well-founded. Further, the court determined that despite Harrison's statements to the contrary, Brockdorf was a target of the investigation, and it was not unreasonable for Brockdorf to believe that a failure to answer questions during an internal investigation could result in termination. Pursuant to *Garrity* and *Oddsen v. Board of Fire & Police Commissioners for the City of Milwaukee,* 108 Wis. 2d 143, 321 N.W.2d 161 (1982), the court held that a statement made under the circumstances was the product of a coercive choice and Brockdorf was entitled to an offer of *Garrity* immunity.

¶ 13. The State appealed the order, and the court of appeals reversed. The court of appeals concluded that "Brockdorf's October 3 statement was not forced or compelled. Rather, she made a voluntary statement during a routine police interview." *State v. Brockdorf,* No. 2004AP1519–CR, unpublished slip op., ¶ 13 (Wis. Ct. App. Dec. 14, 2004). Furthermore, the court distinguished this case from *Garrity:*

> Brockdorf's free choice to speak out or to remain silent was not compromised. She was not told that she would be fired if she exercised her Fifth Amendment right to remain silent. She was told that she would be charged with obstruction if she refused to answer questions in the criminal investigation. This, however, does not rise

644

to the level of coercive conduct so as to negate the voluntariness of her statement. She was not forced to give a statement nor was she told that she could not invoke her right against self-incrimination.

*Id.,* ¶ 9. As such, the court of appeals reversed and remanded the circuit court's decision. Brockdorf petitioned for review, and we now affirm.

## II

■

¶ 14. "In reviewing a motion to suppress, we apply a two-step standard of review. First, we review the circuit court's findings of historical fact, and will uphold them unless they are clearly erroneous. Second, we review the application of constitutional principles to those facts de novo." *State v. Eason,* 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625 (internal citations omitted).

## III

¶ 15. Brockdorf claims that the incriminating statement she made on October 3 was coerced and therefore inadmissible under the Fifth and Fourteenth Amendments to the United States Constitution. She rests her coerced statement claim on *Garrity,* 385 U.S. 493.

■

¶ 16. The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment is applied to each state through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 8 (1964). The privilege against self-incrimination is gen-

erally not self-executing. *Minnesota v. Murphy,* 465 U.S. 420, 427–29 (1984); *Garner v. United States,* 424 U.S. 648, 654 (1976). When a witness chooses not to remain silent in the face of questioning, "his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Murphy,* 465 U.S. at 429. However, "application of this general rule is inappropriate in certain well-defined situations [where] some identifiable factor was held to deny the individual a free choice to admit, to deny, or to refuse to answer." *Id.* (internal quotations omitted). One such situation is the so-called "penalty" case, where the state seeks to induce a witness to "forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' " *Id.* at 434 (quoting *Lefkowitz v. Cunningham,* 431 U.S. 801, 806 (1977)). Between 1967 and 1977, the Supreme Court heard a number of these types of cases providing for a "penalty" exception; one of the first such cases was *Garrity,* 385 U.S. 493.[3]

¶ 17.   In *Garrity,* the Supreme Court of New Jersey directed the State's Attorney General to investigate allegations of fixing traffic tickets by New Jersey police officers. *Id.* at 494. A state statute in force at the time required public employees to cooperate with investigations or such employee would be subject to removal from office and the loss of his or her pension. *Id.* at 494 n.1. Before the officers were questioned, they were also verbally warned of the following: (1) anything said could be used against the officer; (2) the officer could

---

[3] See Stephen D. Clymer, *Compelled Statements From Police Officers and Garrity Immunity,* 76 N.Y.U. L. Rev. 1309, 1315–16 n.16 (2001), for citations to the other "penalty" cases of this era.

refuse to respond if the answer would incriminate him; but (3) a refusal to respond would subject the officer to removal from office. *Id.* at 494. The officers fully cooperated with the investigation and answered all of the questions posed to them. *Id.* at 495. Over their objections, some of the officers' statements given in the investigation were used against them in a later criminal proceeding. *Id.* The officers were convicted and they appealed, claiming their statements were coerced because a failure to answer subjected them to job termination. *Id.*

¶ 18.    In a five-to-four decision, the United States Supreme Court reversed, holding that statements given under threat of discharge from public employment are compelled and may not be used in subsequent criminal proceedings. *Id.* at 500. Characterizing the situation as one in which the officers were forced to choose between "self-incrimination or job forfeiture[,]" the Supreme Court stated the issue as follows:   "The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'" *Id.* at 496 (quoting *Lisenba v. California,* 314 U.S. 219, 241 (1941)).

> The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona,* 384 U.S. 436, 464–465 [(1966)], is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Id.* at 497–98 (internal footnote omitted). The Court ultimately concluded that "the protection of the individual under the Fourteenth Amendment against co-

erced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500.

¶ 19.   In the words of the dissent, "[t]he majority employe[d] a curious mixture of doctrines to invalidate these convictions." *Id.* at 501 (Harlan, J., dissenting). Seemingly, the majority offered two rationales for its decision:   (1) the statements were inadmissible under the Due Process Clause as coerced confessions; and (2) the state's threat to fire the officers unless they gave statements was an unconstitutional condition.[4] Stephen D. Clymer, *Compelled Statements From Police Officers and Garrity Immunity,* 76 N.Y.U. L. Rev. 1309, 1317 (2001). The Court did, however, later compare the officers' compelled statements to immunized testimony, which is inadmissible under the Fifth Amendment privilege against self-incrimination. *Id.* at 1317 n.31 (citing *Lefkowitz v. Turley,* 414 U.S. 70 (1973)). As Professor Clymer notes, lower courts followed suit "describing *Garrity* as a case involving a privilege and compelled statements as 'immunized.' " *Id.* at 1318, 1318 nn.32 & 33.

¶ 20.   This court has not had much occasion to analyze and apply *Garrity,* save for the decision of *Oddsen,* 108 Wis. 2d 143. In *Oddsen,* a male and female

---

[4] *See Garrity v. New Jersey,* 385 U.S. 493, 500 (1963) ("There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price."). "The unconstitutional conditions doctrine prohibits governments from conditioning government-sponsored benefits on recipients' willingness to engage in or abstain from activity that the Constitution shields from direct government interference." Clymer, *Compelled Statements From Police Officers and Garrity Immunity,* at 1348.

officer were discharged for violating the adultery statute. *Id.* at 145. The officers' discharge was based on admissions each made during separate custodial interrogations that they had sexual intercourse with each other on three separate occasions. *Id.* Officer Gail Quade (Quade) made her statement after 14 hours of interrogation, during which time she complained of severe stomach pains, vomited blood, and was told she could not see her doctor until they were done interrogating her. *Id.* at 150–51. Quade was told to "submit to the investigation or be subject to further charges." *Id.* at 148–49. Further, it was "undisputed that she knew that her failure to answer questions could result in her discharge." *Id.* at 149. Similarly, Officer Timothy Oddsen (Oddsen) made his statement after being questioned in excess of 13 hours and without having slept for nearly two days. *Id.* at 151. Both of the officers were also denied counsel despite their requests for one. *Id.* at 157. Furthermore, "Oddsen, like Quade, knew, and in fact was told, that the failure to answer questions truthfully could result in being discharged from the police force." *Id.* at 154.

¶ 21.   After considering these facts, we held that "the confessions extracted from Quade and Oddsen, as a matter of fact and law, were coerced, involuntary, the result of denial of due process, and contrary to fundamental principles of decency and fair play." *Id.* at 146. We further concluded that the officers' statements were coerced and inadmissible as a matter of law under *Garrity. Id.* at 165.

> In the instant case, it is clear that both Oddsen and Quade knew that they could be fired if they refused to answer the questions. It is equally clear that they were not told that, were they to speak, the statements they gave could not be used against them in a prosecution

649

for adultery. Accordingly, the statements they gave were barred as a matter of law. Absent the advice that they could not be prosecuted on the basis of the statement given, their statement was the product of a coercive choice. They were truly between Scylla and Charybdis. If they did not speak, they knew that they would be fired.[5] If they spoke, what they said could lead to prosecution, and most likely, in any event, to conviction and dismissal from their jobs. Absent the warning spelled out in [*Confederation of Police v.*] *Conlisk,* [489 F.2d 891 (7th Cir. (1973)] these coerced statements cannot be used. . . . If a statement is taken under these conditions, i.e., a threat of job forfeiture, a defendant is given immunity from prosecution, at least to the extent that the statement could be the basis for the prosecution. Accordingly, in the instant case, in order to prevent the statement being excluded as a matter of law, where its purpose is discipline, it was incumbent upon the interrogating police officers to advise: . . . "the employee of the consequences of his choice, i.e., that failure to answer will result in dismissal but that answers he gives and fruits thereof cannot be used against him in criminal proceedings."

*Id.* at 164–65 (quoting *Conlisk,* 489 F.2d at 894). Thus, without even considering the egregious facts of the interrogation, the statements were inadmissible as a matter of law because the officers' Fifth Amendment privilege against self-incrimination was essentially eradicated under the duress of an expressly stated "choice" between self-incrimination or the known possibility of job termination for remaining silent. In other words, it was expressly communicated to the officers that a failure to answer the questions posed could

---

[5] From all indications from the prior language in the opinion, the *Oddsen* court inadvertently used the phrase "would be fired" as opposed to "could be fired."

actually result in their termination. As discussed further below, such a threat was not communicated to Brockdorf, and she could not have been fired for choosing to remain silent.

¶ 22. Turning specifically now to the facts of this case, it is undisputed that there was no express threat that Brockdorf would be dismissed if she refused to answer the questions posed to her by Harrison and Wick. However, Brockdorf takes the position that such a threat was implied when looking at the totality of the circumstances as determined by the circuit court. Under the circumstances, Brockdorf argues she had to answer the questions in the interview or face termination, and therefore, she was in the same position as the officers in *Garrity.*

¶ 23. Conversely, the State argues that *Garrity* does not apply in the present action as the circumstances between the two cases are significantly different in the following respects: (1) There is no Wisconsin statute providing that an officer will be fired for exercising his or her right to silence during the course of an internal affairs investigation; (2) There is no MPD policy or regulation providing that an officer has the choice between self-incrimination or job forfeiture; and (3) Brockdorf was never told by her interviewers that she faced this choice. The State contends *Garrity* applies to situations where an express threat of job loss was conveyed to the officer who might otherwise have chosen to remain silent.

¶ 24. As one court has noted, "[w]here the state has directly presented the defendant with the Hobson's choice of either making an incriminating statement or being fired, application of *Garrity* to suppress the statement is clear-cut. However, in cases where the state did not make a direct threat of termination,

application of *Garrity* becomes more problematic." *United States v. Camacho,* 739 F. Supp. 1504, 1515 (S.D. Fla. 1990). In this case, we must now confront this problematic situation.

¶ 25. Several federal and state jurisdictions have adopted a two-part subjective/objective analysis to determine if *Garrity* immunity applies. In other words, "in order for statements to be considered compelled by threat of discharge, (1) a person must subjectively believe that he will be fired for asserting the privilege, and (2) that belief must be objectively reasonable under the circumstances." *People v. Sapp,* 934 P.2d 1367, 1372 (Colo. 1997). The case frequently cited for this analysis is *United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988) (The defendant "must have in fact believed his [] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable."). *See also McKinley v. City of Mansfield,* 404 F.3d 418 (6th Cir. 2005); *United States v. Vangates,* 287 F.3d 1315 (11th Cir. 2002); *United States v. Najarian,* 915 F. Supp. 1460, 1478–79 (D. Minn. 1996); *Camacho,* 739 F. Supp. 1504; *State v. Connor,* 861 P.2d 1212 (Idaho 1993); *State v. Lacaillade,* 630 A.2d 328, 332 (N.J. Super. Ct. App. Div. 1993) ("Fear that loss of employment will result from the exercise of the constitutional right to remain silent must be subjectively real and objectively reasonable."); *State v. Chavarria,* 33 P.3d 922 (N.M. Ct. App. 2001). Thus, cases applying the subjective/objective test have determined that "*Garrity* may be applied to render statements inadmissible even where the threat of termination is implied rather than explicit." *Camacho,* 739 F. Supp. at 1520.

¶ 26. Other courts have applied a similar standard for analyzing the reach of *Garrity* without embracing a specific test. For example, in *United States v.*

*Indorato,* 628 F.2d 711, 715 (1st Cir. 1980), a police officer claimed that he was entitled to *Garrity* immunity because he was implicitly threatened with termination for refusing to answer questions in an investigation. *Id.* The officer based this claim on the state police department rules, with which the officer was thoroughly familiar, that provided for the dismissal of any officer who refused to obey the lawful order of superiors. *Id.* The First Circuit rejected the officer's claim, concluding that nothing in the record suggested that the rules meant an officer who refused on Fifth Amendment grounds to comply with an order to provide self-incriminating statements would be dismissed. *Id.* at 716. The *Indorato* court noted that the officer was not "within the ambit of the coerced testimony doctrine" of *Garrity:*

> In all of the cases flowing from *Garrity,* there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure. In this case, there was no explicit "or else" choice and no statutorily mandated firing is involved. We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity*'s cloak of protection.

*Id.* at 716.

¶ 27. At least one jurisdiction has interpreted *Indorato* and *Friedrick* as applying two distinct lines of authority. *State v. Stinson,* 536 S.E.2d 293, 295 (Ga. Ct. App. 2000) ("[Courts] have developed two distinct lines of authority, one [*Indorato*] requiring an explicit threat of termination and mandatory termination for a failure

to cooperate and the other [*Friedrick*] requiring an objectively reasonable, subjective belief on the part of the officer that he must answer questions or lose his job.").

¶ 28. There is also authority that suggests the *Indorato* court essentially applied a subjective/objective test without explicitly naming it as such. *See Vangates,* 287 F.3d at 1322 n.7 ("Effectively . . . the First Circuit [in *Indorato*] found that the officer's subjective belief that his testimony was compelled was not objectively reasonable.").

¶ 29. In our view, the analyses of *Friedrick* and *Indorato* are functionally equivalent. Although the First Circuit did not explicitly adopt a subjective/objective test in *Indorato,* the court essentially concluded that the implied threat the officer subjectively believed in was not objectively reasonable without an actual, overt threat of termination for invoking the Fifth Amendment right against self-incrimination.

¶ 30. A number of jurisdictions, citing to *Indorato,* have concluded that when there is no overt threat of termination—either through a direct communication of the threat or through a statute, regulation or settled practice to that effect—for an officer who elects to use his Fifth Amendment rights, *Garrity* does not apply. That is, where dismissal is not "an imminent consequence of failing to answer questions[,]" *People v. Coutu,* 599 N.W.2d 556, 561 (Mich. Ct. App. 1999), *Garrity* immunity will not attach. Thus, these courts have given *Garrity* a very narrow interpretation. *See, e.g., People v. Bynum,* 512 N.E.2d 826 (Ill. App. Ct. 1987); *Commonwealth v. Harvey,* 491 N.E.2d 607, 611 (Mass. 1986) ("[T]he fact that there existed the possibility of adverse consequences from the defendant's failure to cooperate does not demonstrate that the defendant was 'compelled' to incriminate himself."); *Coutu,* 599 N.W.2d at 561 ("We find that

because there was no overt threat of employment termination in the event that defendants chose to remain silent instead of answering questions as part of the investigation, *Garrity* does not apply, and suppression of defendants' statements was error."); *State v. Litvin,* 794 A.2d 806 (N.H. 2002).

¶ 31. Brockdorf contends that the subjective/objective test is the appropriate analysis for determining whether an officer's statement given during an internal investigation was unconstitutionally coerced and therefore inadmissible in a subsequent criminal trial. In regards to the application of the subjective component of the proposed test, Brockdorf notes that a court can make a finding of subjective belief in the same way it makes a finding of credibility. *State v. Owens,* 148 Wis. 2d 922, 933, 436 N.W.2d 869 (1989) ("The defendant's state of mind or belief is an historical fact and is reviewed by the clearly erroneous or against the great weight and clear preponderance of the evidence standard.").

¶ 32. As for the objective component of the test, Brockdorf contends that "a necessary prerequisite to concluding that a subjective belief is objectively reasonable is that the belief derived from actions taken by the state." *Camacho,* 739 F. Supp. at 1515; *accord United States v. Montanye,* 500 F.2d 411, 415 (2d Cir. 1974) ("The controlling factor is . . . the fact that the state has involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement."). Under Brockdorf's proposed analysis, any type of coercive action on behalf of the state is apparently sufficient to conclude that the officer's subjective belief is objectively reasonable.

¶ 33. Cases from other jurisdictions have detailed the objective component of the subjective/objective test

with more specificity than merely that the coerciveness arose from state action. *See, e.g., Vangates,* 287 F.3d at 1322 ("In making this [objective] determination, we examine (as we must) the totality of the circumstances surrounding the testimony."); *Sapp,* 934 P.2d at 1373 ("In order for such a belief to be objectively reasonable the belief must result from some significant coercive action of the state. The action of the state must be more coercive than that resulting from the general obligation imposed on a witness to give truthful testimony."); *Chavarria,* 33 P.3d at 927 (quoting *Camacho,* 739 F. Supp. at 1515) ("In applying the test we 'examine the totality of the circumstances.' ").

¶ 34.   For its part, the State argues that *Garrity* should be interpreted narrowly and applied to situations where an express threat of job loss was conveyed to the officer who might otherwise have chosen to remain silent. Under the State's analysis, *Garrity* immunity clearly does not attach to Brockdorf's statement, and the question then becomes whether Brockdorf's statement was voluntary under the totality of the circumstances.

¶ 35.   After reviewing the abundant case law interpreting *Garrity,* we elect to adopt the two-pronged subjective/objective test, as we believe it provides the most useful mode of analysis for determining whether, as a matter of law, an officer's statements given in a criminal investigation are coerced and involuntary, and therefore subject to suppression under *Garrity.* Thus, in order for statements to be considered sufficiently compelled such that *Garrity* immunity attaches, a police officer must subjectively believe he or she will be fired for asserting the privilege against self-incrimination, and that belief must be objectively reasonable. The

determination of the voluntariness of a statement is a question of constitutional fact, which is a mixed question of fact and law reviewed with a two-step process. *State v. Hajicek,* 2001 WI 3, ¶¶ 14–15, 240 Wis. 2d 349, 620 N.W.2d 781. We review the circuit court's findings of historical fact under the clearly erroneous standard, while the circuit court's determinations of constitutional fact are reviewed de novo. *Id.,* ¶ 15.

¶ 36. In applying this analysis, we must ultimately examine the totality of the circumstances surrounding the statements, *State v. Clappes,* 136 Wis. 2d 222, 235–36, 401 N.W.2d 759 (1987). However, in accordance with the analysis of *Indorato* and its progeny, an express threat of job termination or a statute, regulation, rule, or policy in effect at the time of the questioning which provides for an officer's termination for failing to answer the questions posed, will be a sufficient circumstance to constitute coercion in almost any conceivable situation. We believe that the subjective/objective test we adopt today is most in line with the original intent of *Garrity.*

¶ 37. We now apply this test to the case before us. Brockdorf testified at the motion hearing that she figured she would later be fired if she elected not to talk to the detectives on October 3. The circuit court found this testimony credible. As this finding of fact was not clearly erroneous, we cannot overturn this decision. *Owens,* 148 Wis. 2d at 933. Therefore, the subjective prong of the analysis is satisfied. The issue to be resolved is whether this subjective belief was objectively reasonable.

¶ 38. First, we consider whether an express threat was communicated to Brockdorf or if a statute, rule, regulation, or policy actually existed. It is undis-

puted that neither Harrison nor Wick expressly threatened Brockdorf with the loss of her job for choosing to exercise her right to remain silent in the interrogation. Additionally, there is no state law, ordinance, departmental regulation, or longstanding departmental policy that forces an officer to choose between job loss and self-incrimination. Thus, if Brockdorf had elected to exercise her Fifth Amendment privilege against self-incrimination, termination would not have automatically followed *for that reason.* In other words, "dismissal was not an imminent consequence of failing to respond." *Coutu,* 599 N.W.2d at 559.

¶ 39. Next, we consider the other facts and circumstances of this case and examine whether we are presented with a situation where the lack of an express threat is inconsequential when compared to the totality of the circumstances. We conclude this case does not present such a drastic situation. First, it is important to note that Brockdorf was not in custody at the time of the interview, and therefore, *Miranda* warnings were not required. Also, Brockdorf was questioned pursuant to a *criminal* investigation as opposed to a *personnel* investigation. The MPD Policies and Procedures Manual[6] clearly provides a detailed set of rules that investigators must follow for personnel investigations apart from criminal investigations. In personnel investigations, police officers may legitimately be compelled

[6] After oral argument and pursuant to an order dated October 14, 2005, the parties submitted to the court the relevant provisions of the MPD Policies and Procedures Manual. Pursuant to Wis. Stat. § 902.01, in our discretion, we elect to take judicial notice of this document, which is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Wis. Stat. § 902.01(2)(b) (2003–04).

to answer questions with the threat of job termination as long as those statements are not used against the officer in a subsequent criminal proceeding.[7] These are the warnings mandated by *Garrity,* and prior to the interview, they are explicitly laid out to the officer in a PI-21 report that the officer must sign prior to the investigation.[8] In this case, the record shows that Brockdorf was interviewed as part of a criminal and not a personnel investigation, and Harrison informed

---

[7] The state, of course, can compel a public employee to answer questions in a formal or informal proceeding by granting that employee immunity from future criminal prosecution based on the answers given. Such immunity is the equivalent of the protection afforded an officer under *Garrity,* and is referred to as "use immunity." Ultimately, however, the state must decide whether to demand a statement from an employee on job-related matters, in which case it may not use the statement in a criminal prosecution.

*United States v. Vangates,* 286 F.3d 1315, 1321 (11th Cir. 2002) (internal citations omitted).

[8] This form reads in pertinent part as follows:

1.) The Milwaukee Police Department is presently investigating you concerning –
2.) Disciplinary action may result.
3.) This is an internal investigation, and the answers you give, or the fruits thereof, cannot be used against you in a criminal proceeding.
. . . .
5.) Refusal to respond during this investigation, or any response, which is untruthful, could result in your suspension or termination from the Milwaukee Police Department.

Milwaukee Police Department Rules and Procedures Manual, Form PI-21: "Internal Investigation Informing the Member."

Brockdorf of the nature of the investigation prior to interviewing her. Indeed, it is not surprising that Harrison did not give an offer of *Garrity* immunity because as an internal affairs investigator who always works on criminal matters as opposed to personnel matters, she never has to make such offers or complete PI-21 forms.

¶ 40. Brockdorf highlights some of the General Rules and Regulations of the MPD Policies and Procedures Manual, as support for her position that it was objectively reasonable for her to believe her job was in jeopardy. These rules generally speak to an officer's duty to obey a lawful order of a superior officer. We are not persuaded that these rules were sufficiently coercive as to render Brockdorf's statement involuntary. *See Sapp,* 934 P.2d at 1372 ("[C]ourts applying *Garrity* in non-automatic penalty situations have emphasized that ordinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge.").

¶ 41. Furthermore, Brockdorf has never argued that she confused the criminal battery investigation with a personnel inquiry or that the officers expressly did anything to cause her to believe the interview concerned a personnel matter. Ignorance of the MPD Rules and Procedures Manual is not a sufficient defense for a police officer.

¶ 42. Brockdorf points to the following facts, which she claims render objectively reasonable her subjective belief that she would be terminated if she invoked her Fifth Amendment privilege against self-incrimination: (1) she was ordered by a supervisor to report to IAD; (2) she was a target of the investigation contrary to the testimony of Harrison; and (3) she was threatened with a charge of obstructing an officer if she failed to cooperate by providing a statement.

¶ 43. In our view, however, the only "significant coercive action of the state[,]" *Sapp,* 934 P.2d at 1373, that Brockdorf can point to is the alleged threat Harrison and Wilk made to Brockdorf to talk or get charged with obstructing. Without an express threat of termination, however, we conclude that this admonishment did not deprive Brockdorf of her right to make a free and reasoned decision to remain silent. In other words, Brockdorf's belief that she would be terminated for maintaining silence remained objectively unreasonable. Under the totality of the circumstances, we conclude that Brockdorf felt compelled to give a statement because: (1) she had lied to investigators in September about her partner's criminal conduct; (2) she realized she had been caught in the lie; and (3) she concluded the best course of action at that time was to confess to the truth as opposed to continuing to lie or remaining silent. Nothing that Harrison or Wick did was objectively coercive enough for us to conclude that Brockdorf's statement was involuntary under *Garrity.* Subjectively believing that a charge of obstructing an officer might lead to an eventual dismissal somewhere down the line does not mean that it was objectively reasonable to conclude that the right to remain silent on October 3 was effectively eradicated. Given the fact that Brockdorf had already lied to Harrison in her first interview, Brockdorf could have reasonably concluded that her job was in jeopardy, but again she still had the choice to remain silent in the second interview. When we objectively analyze the circumstances before Brockdorf, we conclude that Brockdorf was not forced to choose between "the rock and the whirlpool[,]" *Garrity,* 385 U.S. at 496. Her statement was, as a matter of law, voluntary.

661

IV

¶ 44. If any other citizen had made the statement Brockdorf did in a similar non-custodial, criminal investigation, a court would have no difficulty in concluding such statement was voluntary as a matter of law. Essentially, Brockdorf is looking for greater constitutional protection than the average citizen because she is a police officer; we do not interpret the Fifth Amendment or *Garrity* as providing the expansive protection Brockdorf asks for.

¶ 45. Today, we adopt a two-pronged subjective/ objective test for determining whether, as a matter of law, an officer's statements given in a criminal investigation are coerced and involuntary, and therefore subject to suppression under *Garrity*. Under this test, we examine the totality of the circumstances, but an express threat of job termination or a statute, regulation, rule, or policy in effect at the time of the questioning, which provides for an officer's termination for failing to answer the questions posed, will be a sufficient circumstance to constitute coercion in almost any conceivable situation. Using this analysis, we conclude Brockdorf's incriminating statement was not unconstitutionally coerced under the Fifth Amendment, and *Garrity* immunity does not apply. As such, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 46. N. PATRICK CROOKS, J. (*dissenting*). The majority sets forth the test to determine whether, as a matter of law, a police officer's statements given in a criminal investigation are coerced, and therefore sub-

662

ject to suppression under *Garrity v. New Jersey,*[1] 385 U.S. 493 (1967). The majority opinion articulates the test as follows: "in order for statements to be considered sufficiently compelled such that *Garrity* immunity attaches, a police officer must subjectively believe he or she will be fired for asserting the privilege against self-incrimination, and that belief must be objectively reasonable." Majority op., ¶ 35. The majority then sets forth a framework within which to apply this subjective/objective test:

> Under this test, we examine the totality of the circumstances, but an express threat of job termination *or a statute, regulation, rule, or policy in effect at the time of the questioning which provides for an officer's termination for failing to answer the questions posed, will be sufficient circumstance to constitute coercion in almost any conceivable situation.*

*Id.,* ¶ 3 (emphasis added). I agree wholeheartedly with the test laid out by the majority. I write separately because it is my belief that Vanessa Brockdorf's (Brockdorf) circumstances fall squarely within that test.[2] She received no warnings, either those required by *Miranda*

---

[1] In *Garrity v. New Jersey,* 385 U.S. 493 (1967), the United States Supreme Court considered a case in which police officers who were the subject of an investigation were given the choice to incriminate themselves or to face termination. The Supreme Court held that, under those circumstances, the confessions elicited from the officers were coerced, and therefore inadmissible in any subsequent criminal prosecution under the Fourteenth Amendment of the United States Constitution.

[2] The majority opinion appropriately concludes that Vanessa Brockdorf (Brockdorf) satisfied the subjective portion of the test. *See* majority op., ¶ 37. I take issue only with the majority's conclusion that Brockdorf's subjective belief was objectively unreasonable. Majority op., ¶ 43.

*v. Arizona,* 385 U.S. 436 (1966) had she been in custody, nor those required by *Garrity,* and reasonably believed that she could face a criminal charge and ultimately termination of her job as a Milwaukee police officer, if she invoked her privilege against self-incrimination, and thus failed to cooperate by answering the questions posed by the internal affairs detectives. If what occurred here is not coercion, without any of the required warnings, then I don't know what is. Her subsequent statement, given under such circumstances, was properly suppressed by the Milwaukee County Circuit Court, since it was not a voluntary statement. Applying a totality of the circumstances approach, what occurred here was clearly coercive in nature, and certainly was not voluntary under the *Garrity* decision. Consistent with this court's holding in *Oddsen v. Board of Fire and Police Commissioners for the City of Milwaukee,* 108 Wis. 2d 143, 321 N.W.2d 161 (1982), the statement extracted from Brockdorf was "coerced, involuntary, the result of a denial of due process, and contrary to fundamental principles of decency and fair play." *Oddsen* at 146.

¶ 47.   When Brockdorf arrived at work on October 3, 2002, she was ordered by her sergeant to report to internal affairs. Brockdorf testified that she immediately went to internal affairs, where Detectives Harrison and Wick informed her that they wanted to "requestion [her] regarding the battery, regarding [her] partner."

¶ 48.   While it is undisputed that neither Detective Harrison nor Detective Wick made any statement to the effect that Brockdorf would be terminated if she refused to answer their questions, as the majority has explained such an express threat is not necessary to support an objectively reasonable fear of termination.

Any "regulation, rule, or policy in effect at the time of the questioning which provides for an officer's termination for failing to answer the questions posed, will be sufficient circumstance to constitute coercion in almost any conceivable situation." Majority op., ¶ 3. The Milwaukee Police Department Policies and Procedures themselves clearly lend ample support to the objective reasonableness of Brockdorf's subjective belief that she would ultimately be fired, if she did not answer the questions of the detectives from internal affairs.

¶ 49.    The undisputed facts show that upon arriving at work, Brockdorf was ordered by her supervisor to report to internal affairs. After requesting the presence of a police union representative, she sat for an hour without responding to the internal affairs detectives' questions. Brockdorf soon became a target of the investigation, contrary to the initial representations of Detective Harrison. Further, Brockdorf was threatened with a charge of obstructing an officer if she failed to cooperate by providing a statement.

¶ 50.    At the hearing on the motion to suppress her October 3, 2003 statement, the following occurred:

[Attorney Kohler:] Be specific on who said what to you, if you recall.

[Officer Brockdorf:] Well what I recall is I remember I was up there for like an hour before I even said anything, because I said, "I don't want to talk without a union rep." And I don't remember who said it, but they were both saying to me—I remember they both said to me, "If you don't talk now, you're going to get charged with obstructing." And I went back and forth on if I should wait. But then I was like, well, I don't want to get charged with obstructing.

Q    Did you feel as a police officer you had to answer their questions?

A   Yes. Because I would have been charged with obstructing if I didn't.

Q   Is that the only reason you answered their questions?

A   Yes.

Q   Did you think what would happen to you if you were charged with obstructing?

A   Well they always say in the academy that you get fired for lying, that it's a grave disqualification.

. . . .

Q   Other than being charged [with obstructing], did you fear for your job at that point?

A   Yes, because I didn't—first I wasn't the target, and then all of a sudden I became the target of this investigation.

Q   What did you think was going to happen to you if you didn't talk to them, other than being charged with obstructing?

A   I figured I'd later be fired.

Q   So are those the two reasons why you consented to the interview?

A   Yes.

¶ 51.   Wisconsin Stat. § 946.41 (2003–04) provides, in relevant part: "Resisting or obstructing officer. (1) Whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority, is guilty of a Class A misdemeanor." Being charged with a Class A misdemeanor violates Milwaukee Police Department (MPD) Policies

and Procedures,[3] Rule 2/015.00, which requires that "[m]embers of the police force shall . . . conform to, abide by and enforce all the criminal laws of the State of Wisconsin and the ordinances of the city of Milwaukee. . . ." Furthermore, as a member of the MPD, Brockdorf was required to "promptly obey any lawful order emanating from any officer of higher rank. . . ." MPD Policies and Procedures, Rule 4, Section 2/030.00. A Milwaukee police officer may be terminated based upon the violation of such rules. Rule 1, Section 1/010.20 provides, in relevant part, "[t]he Chief of Police may at his discretion punish by dismissal, demotion, or suspension any member of the Department guilty of violating any of its rules and regulations." In addition, obstructing or failing to give the statement demanded could place Brockdorf in violation of Rule 4, Section 2/010.00, which states in relevant part "Failure on the part of members of the Department to acquaint themselves with and abide by the provisions of the Department's Rules and Procedures Manual as hereby directed shall be considered neglect of duty and shall subject such members to disciplinary action."

¶ 52.   Similarly, a charge of obstructing or failing to give the statement demanded could also violate Rule 4, Section 2/110.00, requiring that "Members of the Department shall communicate promptly to their commanding

---

[3] The several Milwaukee Police Department (MPD) regulations, rules and policies I cite are variously referred to in MPD materials as "General Rules and Regulations," "Rules & Procedures," and "Policies and Procedures." For the sake of consistency, I will refer to them, collectively, as "Policies and Procedures." The MPD Policies and Procedures referred to in this opinion were either submitted by the parties, or were taken from the Milwaukee Police Department web site. Available at: http://www.city.milwaukee.gov/display/router.asp?docid=5011.

officer all catastrophes, crimes . . . which may come to their attention. Members shall not withhold 'tips' or information with a view to personal achievement or for any other reason." In addition, obstructing or failing to give the statement demanded could be considered a violation of Rule 4, Section 2/035.00, which requires that members of the MPD "promptly communicate in writing to their commanding officer any violation of the Department Rules and Procedures Manual or disobedience of others by any other member that may come to their knowledge." Moreover, obstructing or failing to give the statement demanded could legitimately be considered "shrink[ing] from . . . responsibility" in violation of Rule 4, Section 2/050.00, which results in one being "considered guilty of gross neglect of duty and unworthy of a place in the service."

¶ 53. Brockdorf knew that internal affairs wanted to meet with her. She was told that if she failed to respond to the investigators' questions, she would be charged with obstructing. In light of the MPD Policies and Procedures, it was objectively reasonable for Brockdorf to believe that she faced a *Garrity*-like choice of self-incrimination or job forfeiture. *Garrity,* 385 U.S. at 469. As the *Garrity* Court explained, "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." *Id.* at 498.

¶ 54. The majority emphasizes the fact that "Brockdorf was questioned pursuant to a *criminal* investigation as opposed to a *personnel* investigation." Majority op., ¶ 39 (emphasis in original). Only in personnel investigations, the majority opinion claims, does the MPD Policies and Procedures Manual require *Garrity* warnings.[4] *Id.* Therefore, the majority con-

---

[4] The *Garrity* warnings used by the MPD provide " 'Refusal to respond during this investigation, or any response which is

cludes, it was unreasonable for Brockdorf to believe she faced termination if she failed to answer internal affairs' questions. However, the majority opinion fails to be persuasive when it claims that Brockdorf knew she was being interviewed only as part of a criminal, rather than a personnel, investigation. Where in the record is it established that she understood such meaningful distinction where internal affairs was involved? Nowhere in the record before us.

¶ 55. The direct examination of Detective Harrison establishes that the internal affairs division has responsibility to investigate both personnel and criminal matters.

> [Mr. Reddin:] How long have you been a Milwaukee police officer?
>
> [Detective Harrison:] In April it will be 11 years.
>
> Q  And what is your current duty assignment?
>
> A  I'm a detective in internal affairs division.
>
> Q  And are you in the personnel side or the criminal side?
>
> A  Criminal side.

We again emphasize that nothing in the record shows that it was made clear to Brockdorf that the investigation by internal affairs was criminal, and not a personnel matter. As Detective Harrison further testified:

> [Attorney Reddin:] And did you advise her prior to speaking to her about the nature of the investigation?

---

untruthful, could result in your suspension or termination from the Milwaukee Police Department.'" Majority op., ¶ 39 n.8 (citation omitted).

[Detective Harrison:] Yes.

Q   What did you tell her?

A   I advised her that we wanted to question her regarding a use of force complaint and that she was not the target of the investigation.

Such a statement certainly does not clearly indicate that the investigation was criminal in nature. It appears that no one explained to Brockdorf the difference between a criminal and a personnel investigation by internal affairs.

¶ 56.   It is also apparent from Brockdorf's own testimony that she was confused as to the nature of the investigation that resulted in her questioning by internal affairs.

[Officer Brockdorf:] I said I didn't want to talk without a union rep.

. . . .

[Attorney Kohler:] And why did you want a union rep?

A   Because I didn't know what was going on, and I should have had a union rep the first time they talked to me.

Furthermore, although the detectives might have indicated the questioning concerned the actions of her partner, during the course of her interview with internal affairs, as noted previously, it became clear to Brockdorf that she, herself, had now become the target of an investigation—one that she subjectively, and reasonably, believed could ultimately lead to her termination as a Milwaukee police officer.

¶ 57.   Therefore, while the record may arguably show that Brockdorf was interviewed on October 3, 2003, as part of a criminal, rather than a personnel,

670

investigation, nothing establishes that Brockdorf herself understood such a significant distinction, nor could she reasonably be expected to understand the difference under the totality of the circumstances that occurred here.

¶ 58. The MPD Policies and Procedures contain several rules that a charge of obstructing or failing to give the statement demanded could have violated, thus subjecting Brockdorf to disciplinary charges. That, coupled with the fact that such disciplinary actions for such violations could result in termination, clearly establishes that "a . . . regulation, rule, or policy . . . which provides for an officer's termination for failing to answer the questions posed" was in effect at the time Brockdorf was forced to choose. Majority op., ¶ 3. Her impossible choice was between self-incrimination and the resulting criminal charge of obstructing, or a charge of obstructing or failing to give the statement demanded. Either way, the likely result was the ultimate termination of her job as a Milwaukee police officer. Under the totality of the circumstances, it was objectively reasonable that Brockdorf subjectively believed she would ultimately face termination for failing to answer questions of the detectives from internal affairs, and her answers were, therefore, coerced, and *Garrity* applies. Her statement was correctly suppressed by the Milwaukee County Circuit Court, since it was inadmissible under the Fourteenth Amendment of the United States Constitution.

¶ 59. For the above stated reasons, I respectfully dissent.

¶ 60. I am authorized to state that Justices DAVID T. PROSSER and LOUIS B. BUTLER, JR. join this opinion.

¶ 61. LOUIS B. BUTLER, JR., J. (*dissenting*). I join the dissent of Justice N. Patrick Crooks, as I conclude there was compulsion in this case. I write separately to emphasize the necessity and importance of police department internal investigations.

¶ 62. Every criminal prosecution depends upon the quality and accuracy of the work done by those working in law enforcement. Each police investigation must be carefully conducted to ensure that the guilty are apprehended and that the innocent go free. Citizens regularly depend on law enforcement officers for aid, comfort and assistance. Trust is the cornerstone of the relationship that law enforcement shares with the rest of the community.

¶ 63. When that trust is broken, people lose respect for law enforcement. Thus, it is critically important that law enforcement officers tell the truth at all times. The integrity of individual officers is a necessary component of the criminal justice system. Every investigation must be done in a thorough and thoughtful manner. And when problems occur with individual officers in the performance of their duties, law enforcement must be able to police itself in a constitutionally permissible fashion. *Garrity*[1] warnings provide the mechanism for conducting internal investigations in a constitutionally permissible way.

¶ 64. For the foregoing reasons, I respectfully dissent.

---

[1] *Garrity v. New Jersey*, 385 U.S. 493 (1967).