STATE of Wisconsin, Plaintiff-Appellant,

v.

Jeffrey C. McPIKE, Defendant-Respondent.

Court of Appeals

*No. 2008AP3037–CR. Submitted on briefs June 17, 2009.*
*—Decided October 29, 2009.*

2009 WI App 166

(Also reported in 776 N.W.2d 617.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeffrey M. Shock*, assistant district attorney for Jefferson County, assisted by *Daniel J. O'Brien*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Nicholas E. Fairweather* and *Jeffrey L. Vercauteren* of *Cullen Weston Pines & Bach LLP*, Madison.

Before Dykman, P.J., Vergeront and Lundsten, JJ.[1]

¶ 1. LUNDSTEN, J. Police detective Jeffrey McPike is facing a trial on an OWI charge. He moved the circuit court to suppress test results and statements

---

[1] This case was converted from a one-judge appeal to a three-judge appeal pursuant to WIS. STAT. RULE 809.41 (2007–08). All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

he made after a police supervisor ordered him to submit to a preliminary breath test (PBT). The circuit court granted McPike's suppression motion after applying *State v. Brockdorf*, 2006 WI 76, 291 Wis. 2d 635, 717 N.W.2d 657. In *Brockdorf*, the supreme court adopted a two-part subjective/objective test for deciding whether a public officer's statements must be suppressed because the statements have been coerced by the officer's public employer. Because the facts of McPike's case are substantially similar to those in *Brockdorf*, we conclude, as the court did in *Brockdorf*, that suppression is not required. We reverse the circuit court's order with one exception. For reasons we will explain, we affirm the part of the order suppressing the PBT results. We remand for further proceedings.

### *Background*

¶ 2.   McPike, a Madison police detective, allegedly drove while intoxicated in March 2008. He was charged with first offense OWI, was placed on administrative leave, and was subject to an internal investigation. Approximately one month later, at 9:00 a.m., McPike had an appointment with a police lieutenant in the internal affairs unit.

¶ 3.   When McPike arrived for the appointment, the lieutenant detected an odor of intoxicants on McPike and noticed that he had glassy, red eyes. After observing McPike, an assistant chief confirmed the lieutenant's suspicions.

¶ 4.   The lieutenant asked McPike to submit to a PBT, and McPike stated:   "I'd rather not." The lieutenant told McPike that she would likely "compel" him to submit, to which McPike replied:   "If I don't have to, I don't want to. I haven't been drinking, but I don't want

to take a PBT if I don't have to." Ultimately, the lieutenant told McPike that she was "administratively compelling" him to submit to the PBT. Neither the lieutenant nor anyone else advised McPike that a refusal to submit to the PBT would result in termination or any other discipline.

¶ 5. McPike submitted to the PBT test, and the results showed a blood alcohol concentration of 0.132. After seeing the results, McPike said something to the effect of "I can't do this anymore" and that he was "pretty much done." McPike admitted he had been drinking the night before and said the result of the PBT must have been "residual from last night." He said that his wife had asked him what would happen if his breath was tested, and he told her that he hoped it would come back a 0.00. McPike also submitted to field sobriety tests.

¶ 6. The State charged McPike with a second drunk driving offense. McPike moved to suppress all of his test results and statements. The circuit court granted the motion. The court found that McPike subjectively believed that a failure to submit to the PBT and to respond to questioning could result in his termination. The court also concluded that McPike's belief was objectively reasonable because the lieutenant told McPike that she was "administratively compelling" him to submit to the PBT and to cooperate. Accordingly, the court suppressed McPike's test results and statements under *Brockdorf*. The State appeals. We reference additional facts as needed below.

### *Discussion*

¶ 7. The Court in *Garrity v. New Jersey*, 385 U.S. 493 (1967), held that, when a public officer makes statements under "threat of removal from office," those

statements are coerced as a matter of law and may not be used against the officer in criminal proceedings. *Id.* at 500. The *Garrity* Court did not, however, provide a test for determining what is a sufficient "threat of removal from office." After *Garrity*, courts in many jurisdictions, including our supreme court, have attempted to fill the void. *See Brockdorf*, 291 Wis. 2d 635, ¶¶ 20–35; *see also, e.g., United States v. Indorato*, 628 F.2d 711, 715–16 (1st Cir. 1980); *United States v. Camacho*, 739 F. Supp. 1504, 1513–15 (S.D. Fla. 1990).

¶ 8. In *Brockdorf*, our supreme court adopted a two-pronged "subjective/objective test" for determining whether statements should be suppressed under *Garrity*: "[1] [the public employee] must subjectively believe he or she will be fired for asserting the privilege against self-incrimination, and [2] that belief must be objectively reasonable." *Brockdorf*, 291 Wis. 2d 635, ¶ 35. In applying this test, courts look to the "totality of the circumstances surrounding the statements." *Id.*, ¶ 36; *see also id.*, ¶¶ 3, 45.[2]

¶ 9. In many respects, the facts here parallel those in *Brockdorf*. So much so that we conclude that *Brockdorf* requires reversal of the circuit court's suppression order here, with one exception—the PBT results—which we pause to explain.

[2] The court in *State v. Brockdorf*, 2006 WI 76, 291 Wis. 2d 635, 717 N.W.2d 657, noted that "an express threat of job termination or a statute, regulation, rule, or policy in effect at the time of the questioning which provides for an officer's termination for failing to answer the questions posed, will be a sufficient circumstance to constitute coercion in almost any conceivable situation." *Id.*, ¶ 36; *see also id.*, ¶¶ 3, 45. But, as we indicate elsewhere in the text, none of these circumstances are present here.

¶ 10.   McPike asked the circuit court to suppress at his OWI trial all statements and the "result of any testing."[3] As we shall see, McPike's statements and the results of his field sobriety tests are admissible. But the PBT evidence is a different matter. The results of a PBT are generally inadmissible at trial, regardless of *Brockdorf* and *Garrity*. *See* WIS. STAT. § 343.303. Accordingly, we affirm suppression of the PBT results. We do not mean to suggest, however, that all evidence relating to the PBT is inadmissible at trial. It is possible, for example, that the fact that McPike took a PBT may be admissible to give context to his statements or for some other purpose. Still, this suppression issue has not been argued before the circuit court or this court and, therefore, we do not address it further.

¶ 11.   Returning to the *Brockdorf* issue, we begin with a brief summary of that case.

¶ 12.   In *Brockdorf*, a Milwaukee police officer witnessed her partner beat a shoplifting suspect. *Brockdorf*, 291 Wis. 2d 635, ¶¶ 4–7. The officer was interviewed on two separate occasions by one or more Milwaukee Police Department internal affairs detectives. *Id.*, ¶¶ 1, 6–7, 9. On the first occasion, she lied about her partner's actions. During a second interview, she eventually admitted the truth. *See id.*, ¶¶ 6–7, 8 n.2. After the officer was charged with obstructing, she argued that the statement she gave in her second interview must be suppressed under *Garrity* because, immediately before she gave that statement, detectives

---

[3] The parties do not discuss whether McPike's motion encompassed the results of a chemical test other than a PBT. Consequently, when we speak of test results in this case, we refer only to McPike's PBT results and his field sobriety test results.

told her that she would be charged with obstructing if she refused to talk and she believed she would be fired if she did not cooperate. *Brockdorf*, 291 Wis. 2d 635, ¶¶ 2, 8–9.

¶ 13.   We turn now to compare the application of the two-pronged subjective/objective test in *Brockdorf* with the facts here.

¶ 14.   The subjective prong of the test was not seriously contested in *Brockdorf*. Rather, the *Brockdorf* court affirmed, at least implicitly, the circuit court's finding that the officer subjectively believed she would be terminated if she refused to give a second statement. *See id.*, ¶¶ 12, 43. Similarly, the State here does not challenge the circuit court's finding that McPike subjectively believed that he could be terminated if he refused to submit to the PBT and otherwise cooperate. Accordingly, we accept this finding for purposes of our review. As in *Brockdorf*, the contested issue is whether the police officer's belief was *objectively* reasonable.

¶ 15.   Like *Brockdorf*, McPike's case does not involve an express threat of termination, nor does it involve a statute, rule, regulation, or policy specifying that McPike would be terminated if he refused to cooperate. Thus, as in *Brockdorf*, the dispositive question is whether "the lack of an express threat is inconsequential when compared to the totality of the circumstances." *Id.*, ¶ 39.

¶ 16.   In *Brockdorf*, the officer pointed to various circumstances, including that (1) her supervisor ordered her to report to the internal affairs department, (2) she was the "target" of an investigation, and (3) the investigating detectives threatened her with obstructing if she failed to cooperate. *Id.*, ¶ 42. On these facts, the court determined that

567

the only "significant coercive action of the state" that Brockdorf can point to is the alleged threat . . . to talk or get charged with obstructing. Without an express threat of termination, however, we conclude that this admonishment did not deprive Brockdorf of her right to make a free and reasoned decision to remain silent. In other words, Brockdorf's belief that she would be terminated for maintaining silence remained objectively unreasonable . . . . Subjectively believing that a charge of obstructing an officer might lead to an eventual dismissal somewhere down the line does not mean that it was objectively reasonable to conclude that the right to remain silent . . . was effectively eradicated.

*Id.*, ¶ 43 (citation omitted).

¶ 17. Here, the circumstances are substantially similar and, if anything, less coercive. McPike was reporting for an appointment with internal affairs and was the target of an investigation. Instead of being threatened with obstruction, however, McPike was "administratively compelled" to submit to a PBT. The evidence shows that this was no more coercive than the threat of obstruction in *Brockdorf*. Specifically, the evidence shows that, when the lieutenant told McPike that she was "administratively compelling" him to submit to a PBT, this meant only that the lieutenant was invoking a Madison Police Department policy requiring officers to submit to a PBT if a supervisor requests one. The evidence further shows that McPike's failure to submit to the PBT could have been deemed first-offense insubordination under those policies, but that the policies do not specify termination as a consequence for refusing to submit to a PBT or for first-offense insubordination. McPike points to no evidence that the department engaged in a different practice than that reflected in the policies or that the department routinely terminated officers for these types of violations.

¶ 18.   McPike called a witness on his behalf from the Wisconsin Professional Police Association, which represents law enforcement officers for contractual and disciplinary issues. The witness testified that insubordination is a "very serious" policy violation. He also testified that a refusal to follow an order to submit to a PBT would constitute a serious policy violation that would typically involve a minimum of suspension and "could lead to termination in some cases." But this testimony does not help McPike because the witness did not indicate whether McPike's refusal would have fallen into the category of "some cases" that end in termination.

¶ 19.   We acknowledge that the evidence may support the conclusion that McPike reasonably believed, *in light of his prior OWI,* that, if he refused to cooperate, he might eventually be terminated. However, *Brockdorf* is similar in this respect as well. In *Brockdorf,* the court acknowledged that, in view of the fact that Brockdorf had previously lied to an investigating officer, "Brockdorf could have reasonably concluded that her job was in jeopardy." *Brockdorf,* 291 Wis. 2d 635, ¶ 43. The *Brockdorf* court nonetheless held the officer's statements admissible. *Id.,* ¶¶ 43–45.

¶ 20.   Thus, *Brockdorf* apparently directs that our focus must be on the government's conduct at the time that McPike was "administratively compelled" to submit to the PBT and questioned, not on what McPike might reasonably have feared given his own prior conduct. As we have explained, the immediate threat McPike faced for failing to submit to a PBT was that he would be found guilty of insubordination. McPike may have feared that he also faced termination, but that fear, if reasonable, depended on his prior OWI offense.

¶ 21.   McPike argues that, in contrast to *Brockdorf*, the evidence he seeks to suppress arose in a personnel investigation instead of a criminal investigation. We do not, however, perceive any reason why this fact should weigh in favor of McPike. The distinction was important in *Brockdorf* because the Milwaukee Police Department policies specifically provided that an officer could be terminated for failure to cooperate in a personnel investigation. *See id.*, ¶ 39 & n.8. Here, in contrast, McPike points to nothing in the record showing that the Madison Police Department policies contain such a provision.

¶ 22.   McPike also points out that as many as five supervisors had contact with him during the time he was questioned and that he was kept under constant surveillance by a supervisor throughout that time. But McPike fails to explain why this circumstance would have made it more reasonable to believe that McPike was being threatened with termination.

¶ 23.   In sum, as in *Brockdorf*, nothing the investigating officers "did was objectively coercive enough for us to conclude that [the challenged statements and evidence were] involuntary under *Garrity*." *Id.*, ¶ 43. Consequently, we conclude that McPike did not have the type of objectively reasonable fear of termination contemplated in *Brockdorf*.

¶ 24.   We have resolved this case by comparing its facts with those in *Brockdorf* and concluding that the analysis used in *Brockdorf* compels us to reverse part of the circuit court's suppression order. At the same time, we have difficulty understanding the part of *Brockdorf* that applies the objective prong of the test to the facts in that case. The objective prong asks whether a public employee's subjective belief—that he or she will be fired for asserting the privilege against self-incrimination—is objectively reasonable in light of "the totality of the

circumstances." *Id.*, ¶¶ 35–36. But when the *Brockdorf* court applied this language to whether the officer's belief was objectively reasonable, the court declined to consider her knowledge that she had earlier lied to detectives. Why was this circumstance not part of the totality of the circumstances? If the issue is whether the belief is objectively reasonable, what logic supports ignoring a fact that would suggest to the officer that she faced termination if she did not cooperate? As we previously noted, the *Brockdorf* court stated: "Given the fact that Brockdorf had already lied to [an investigating officer] in her first interview, Brockdorf could have reasonably concluded that her job was in jeopardy . . . ." *Id.*, ¶ 43 (emphasis added). Why then was this reasonable fear not reasonable for purposes of the objective prong of the test? The *Brockdorf* court does not explain. Accordingly, although we follow *Brockdorf*'s lead and ignore McPike's prior OWI, we are unable to discern why this fact is not part of the totality of the circumstances for purposes of the objective prong of the test.

### *Conclusion*

¶ 25. For the reasons above, we reverse the circuit court's suppression order, except that we affirm the portion of the order suppressing the results of the PBT.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings.