2001-NMCA-095

33 P.3d 922

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Israel CHAVARRIA, Defendant–Appellee.**

**No. 21,739.**

Court of Appeals of New Mexico.

Oct. 2, 2001.

Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, Santa Fe, NM, for Appellant.

Albert J. Costales, Truth or Consequences, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} The State appeals the suppression of Defendant's self-incriminating statements given to investigating law enforcement officers. Defendant was charged with criminal sexual penetration of a female inmate while he was a corrections officer at the Doña Ana County detention center (detention center). The trial court determined Defendant was required to give the statements on pain of losing his job as a corrections officer in violation of the Fifth Amendment to the United States Constitution, and granted his motion to suppress based "on the totality of the circumstances and the involuntary nature of the statements and polygraph exam of the Defendant." We agree with the trial court and affirm.

## STANDARD OF REVIEW

{2} In reviewing the grant of a motion to suppress, this Court must determine "whether the law was correctly applied to the facts, viewing [the facts] in a light most favorable to the court's ruling." *State v. Ingram*, 1998–NMCA–177, ¶ 5, 126 N.M. 426, 970 P.2d 1151. When the issue is whether a statement was voluntary, we consider the totality of the circumstances, deferring to the trial court's findings of fact where the evidence conflicts, but reviewing legal issues de novo. *State v. Cooper*, 1997–NMSC–058, ¶ 26, 124 N.M. 277, 949 P.2d 660.

## BACKGROUND

{3} Defendant's testimony conflicted with that of his superiors and the investigating officers. We view the testimony in the "light most favorable to the court's ruling," *Ingram*, 1998–NMCA–177, ¶ 5, 126 N.M. 426, 970 P.2d 1151, and conclude the trial court must have decided that Defendant was more credible. We therefore set forth Defendant's version of the facts, while briefly indicating the State's contrasting version.

{4} Defendant was twenty-five years old and had approximately one year of college and one year of experience at the detention center. Upon return from vacation, he was asked to report to detention center administrator Jeff Garbow and also to the center's captain, Joe Alvarez. Defendant was informed he was on administrative leave pending allegations of sexual misconduct against him. Garbow said in a "demanding" tone that Defendant was to report by telephone to Chuck Franco, whom Defendant knew to be a sheriff's deputy, and as such, another county official, to set up an appointment for Franco to take a statement from Defendant. Garbow told Defendant he could not come back to work until he had given Franco a statement. Alvarez instructed Defendant to turn in any property issued by the county, "such as badges, clothes, [and] footwear." One of the men reminded Defendant of the following portions of the detention center's policies and procedures manual requiring employees to:

Answer truthfully and to the best of their knowledge all questions, specifically directed and limited to the scope of employment and operations of the Facility, which may be asked of them.

Cooperate fully with investigators in any internal investigation and shall be offered all rights and protection provided by law, this manual, and the County regulations.

The manual also stated that:

Employees may be required as a condition of employment and/or continued employment, to take a polygraph test. The answers given by employees cannot be used against them in any criminal prosecution at a later date. To refuse to take a polygraph test may result in disciplinary action up to and including termination.

{5} Defendant felt obligated under county policy to talk to investigating officials because he was afraid he would lose his job if he did not. He was aware that allegations concerning guards were investigated by the sheriff's office and by internal employees of the jail working together. Defendant called Franco and left a message. They actually conversed when Franco returned the call. Franco said, "I need you to be in my office at 9 a.m." Franco called again early the next morning to confirm that Defendant would be at the sheriff's department at 9 a.m. that same day.

{6} Defendant spent the morning giving statements and taking a polygraph examination at the sheriff's office. Defendant did not feel free to leave at any time during the morning because the door was locked. He also felt that "under [the] policy of the county you are obligated as an employee to talk— to talk to any and all county officials or otherwise making an investigation."

{7} At the sheriff's office, Defendant gave a tape-recorded statement to Franco. Before the recorder was turned on, Defendant asked what was going on. Franco told him he was accused of sexual misconduct. Defendant testified that Franco told Defendant "he would be reading me my rights, for me not to get scared but it was a policy that he had to follow because without [*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] all this would be jeopar-

dized." Defendant asked Franco if he needed an attorney. Franco replied that he did not at present. Franco advised Defendant to resign because a resignation would look better on his record than a termination. He told Defendant it was important for Defendant to give a statement "because your job, your family, your life all depend on it."

{8} Franco counseled Defendant to take a polygraph examination to clear himself. Defendant agreed to take the examination because he felt "that my job was in jeopardy." Franco left the room and Frank Ruiz, another sheriff's deputy, came in to administer the polygraph examination. Ruiz recorded the session. Defendant testified he had exchanges with Ruiz after the session was over which were not recorded. It appears Defendant again raised the question whether he needed an attorney. Defendant asked "when was I being charged and [Ruiz] said I don't know at this time if you are or if you're not but we know that you did it, so just come up and let us know." Ruiz then "explained to me [Defendant] that I would have to talk to Mr. Franco again and explain to Franco exactly what I told him [Ruiz], what he had discovered on his polygraph." Ruiz left and Franco came in. Franco told Defendant he had to give another statement. Defendant proceeded to do so.

{9} Ruiz and Franco each separately read Defendant his rights under *Miranda* at some point while the recorder was running. Franco asked if Defendant understood his rights and Defendant replied that he did. Ruiz told him to sign a waiver of his rights. Defendant complied. Defendant did not feel that the *Miranda* warnings gave him a free choice because he felt his job was at stake.

{10} Franco and Ruiz each offered strikingly different testimony. Franco said that the only discussion not on tape consisted of questions about "personal history information," such as Defendant's date of birth and address. He denied ever telling Defendant that Defendant was required to talk. Ruiz testified that all of his conversation with Defendant was recorded. Both men perceived Defendant to be acting voluntarily.

{11} Alvarez, the only detention center administrator to testify, agreed that Defendant was told he would be on administrative leave while the charges were investigated. While at one point Alvarez denied that Defendant was told he had to talk to Franco or that Defendant could not return to work until he had talked to Franco, during cross-examination he agreed that Defendant was told his job was dependent on the outcome of the investigation. Alvarez affirmed that an employee must submit to a polygraph examination during an internal investigation. Alvarez was asked whether employees "were led to understand that it's protocol, it's expected that they cooperate with any criminal investigation of themselves." He replied, "Of any sort. Of themselves, or anybody else, or the jail, or any kind of criminal investigation." Sometimes, if the investigation is "of a serious nature the county will hire an outside entity, the insurance company or somebody, to do it who also would be acting under the county policies." Franco had ongoing contacts with the jail and jail administration involving criminal investigations.

## DISCUSSION

 {12} The Fifth Amendment to the Constitution of the United States provides that no one shall "be compelled in any criminal case to be a witness against himself." The Fifth Amendment is applied to each state through the Fourteenth Amendment. *See, e.g., Schmerber v. California,* 384 U.S. 757, 760–61, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Public employees may not be required to waive their Fifth Amendment privilege on pain of losing their jobs. *Garrity v. New Jersey,* 385 U.S. 493, 497–98, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Public employees "may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions." *Lefkowitz v. Turley,* 414 U.S. 70, 79, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *accord Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation,* 392 U.S. 280, 285, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *In re Grand Jury Subpoenas Dated December 7 and 8 v. United States,* 40 F.3d 1096, 1102 (10th Cir. 1994).

Fifth Amendment law for public employees attempts to strike a balance between the employee's privilege against self-incrimination and the state's interest in obtaining information necessary for the advancement of governmental functions. In short, the state has a choice between either demanding a statement from an employee on job-related matters, in which case it [cannot] use the statements in a criminal prosecution, or prosecuting the employee, in which case it cannot terminate the employee for refusing to give a statement.

*United States v. Camacho,* 739 F.Supp. 1504, 1514–15 (S.D.Fla.1990) (citations omitted).

{13} The issue is one of first impression in New Mexico. *Cf. State v. Gutierrez,* 119 N.M. 618, 622–23, 894 P.2d 395, 399–400 (Ct. App.1995) (discussing *Garrity* in the context of a parolee's claim of violation of his Fifth Amendment right in a parole revocation proceeding, and stating that under *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), "one cannot rely on the *Garrity* exception" simply because of a fear or reasonable belief that the evidence presented to the tribunal will result in adverse consequences).

### 1. What Test to Apply

{14} Several courts have used a two-part test to apply the doctrine initiated by *Garrity*. Succinctly summarized, this test is: "Fear that loss of employment will result from the exercise of the constitutional right to remain silent must be subjectively real and objectively reasonable." *State v. Lacaillade,* 266 N.J.Super. 522, 630 A.2d 328, 332 (Ct.App.Div.1993), adopting the analysis in *United States v. Friedrick,* 842 F.2d 382, 395 (D.C.Cir.1988); *accord Camacho,* 739 F.Supp. at 1515, 1520; *People v. Sapp,* 934 P.2d 1367, 1372 (Colo.1997) (en banc); *State v. Connor,* 124 Idaho 547, 861 P.2d 1212, 1213–14 (1993).

{15} In considering the *Garrity* doctrine, at least two courts have expressed concern about whether the evidence showed an explicit, actual, overt threat of dismissal for refusal to answer questions. *See United States v. Indorato,* 628 F.2d 711, 715–16 (1st

Cir.1980) (stating implied threat, with no statute or ordinance mandating dismissal for refusal to answer questions, falls outside the *Garrity* "coerced testimony doctrine"); *People v. Coutu*, 235 Mich.App. 695, 599 N.W.2d 556, 560–61 (1999) (holding that because there was no overt, actual threat of dismissal, *Garrity* did not apply). These cases did not employ the *Friedrick* subjective/objective analysis.

{16} Cases applying the subjective/objective test have permitted a determination of a constitutional violation "where the threat of termination is implied rather than explicit." *Camacho*, 739 F.Supp. at 1520; *see Friedrick*, 842 F.2d at 400–02 (basing *Garrity* violation primarily on the government's treatment of the defendant as an employee; on the confusing nature and complexity of the relationships; on the fact that the defendant was ordered by his employer, the FBI, to meet with Department of Justice interviewing personnel; on the fact that the defendant was indisputably obliged to answer all questions truthfully, particularly in view of an FBI internal form providing that an FBI employee's refusal to answer could result in dismissal; and on the fact that defendant was informed the investigation was a joint FBI/DOJ inquiry).

▆▆▆ {17} We adopt the two-part, subjective/objective test in determining whether a public employee's statements are involuntary and inadmissible in evidence when it is asserted that the employee was coerced into waiving his Fifth Amendment right against self-incrimination through the threat of losing his job. *See Friedrick*, 842 F.2d at 395; *Camacho*, 739 F.Supp. at 1515, 1520. In applying the test, we "examine the totality of the circumstances surrounding the statements." *Id.* at 1515; *Aguilar v. State*, 106 N.M. 798, 800, 751 P.2d 178, 180 (1988).

▆▆▆ {18} "[A] necessary prerequisite to concluding that a subjective belief is objectively reasonable is that the belief derived from actions taken by the state." *Camacho*, 739 F.Supp. at 1515. The constitutional violation does not, however, require proof of coercion through a direct threat based on statute or ordinance, or express policy or rule requiring a waiver of the Fifth Amendment privilege against self-incrimination. The violation can occur without an express, direct threat; that is, taking into consideration the totality of circumstances, the violation can occur where a defendant "subjectively believed that he was compelled to give a statement upon threat of loss of job" and that "belief [was] objectively reasonable at the time the statement was made." *Id.* (emphasis omitted). The State has the burden to prove the statements were voluntary. *Aguilar*, 106 N.M. at 800, 751 P.2d at 180 ("If the state fails to prove voluntariness [of the confession] by a preponderance of the evidence, the trial court must rule that the confession was involuntary as a matter of law.").

**2. Analysis and Result**

▆▆▆ {19} Defendant testified he talked to the investigators because he feared he would lose his job if he did not. Defendant's reaction to the external facts "was entirely understandable." *Friedrick*, 842 F.2d at 400; *see Aguilar*, 106 N.M. at 800, 751 P.2d at 180 (stating the court's analysis involves "the largely inferential determination of how the accused reacted to the external facts"). The evidence, which we must assume the trial court believed, satisfies the subjective part of the test. Defendant's subjective belief alone, however, is not enough to warrant suppression of the statements. We must examine whether his belief was objectively reasonable under all the circumstances.

{20} Defendant's detention center superiors told him he had to talk to Franco and give him a statement, he could not come back until he had done so, and his job depended on his doing so. They called Defendant's attention to the written detention center policy that in internal investigations employees must answer all questions truthfully, must cooperate fully with investigators, and must take polygraph tests or risk termination for refusal. They required that Defendant return all county property, after placing him on administrative leave. They sent Defendant to Franco, a county deputy who had been involved in other investigations around the jail. Franco told Defendant when and where to show up for his interview. He told Defendant that he needed not only to give a state-

ment but also had to submit to a polygraph examination. Franco's ambiguous statement to Defendant about *Miranda* implied the warnings were just a formality. Franco answered in the negative when Defendant asked if he needed an attorney. Franco gave Defendant employment advice, including advising Defendant to resign rather than be terminated, and to give a statement because Defendant's job depended on it. Franco passed Defendant to Ruiz to conduct a polygraph examination.

{21} While these circumstances show it was objectively reasonable for Defendant to believe that Franco was conducting an internal employee investigation for the detention center, that Ruiz was assisting Franco, and that he had to talk or lose his job, the evidence supporting an objectively reasonable belief derived from actions taken by the State does not consist of Defendant's testimony alone. *See Connor*, 861 P.2d at 1213–14 (declining to find defendant's fear of termination objectively reasonable when the only evidence was defendant's testimony). Alvarez conceded that Defendant was told his job depended on talking to Franco, that Franco had worked with jail authorities on other investigations, and that the written personnel policy as reflected in the excerpt quoted above was pointed out to Defendant. Alvarez's insistence that employees had to cooperate with an investigation "of any sort" or "of themselves" lends further credence to the objective reasonableness of Defendant's belief he had to answer questions or lose his job.

{22} In contending that it was not objectively reasonable for Defendant to conclude that this was an internal investigation, the State argues that a twenty-five-year-old detention officer with one year of experience and with one year of college education should have been able to tell the difference between an internal investigation and a criminal investigation. We do not agree. Defendant may not have been explicitly told the investigation was internal, and not criminal, or explicitly told he would be terminated if he did not talk to Franco, but those conclusions were logical and reasonable ones to draw from the totality of the circumstances. We

do not place on Defendant an obligation to intuit the true nature of the situation when his supervisors blurred the lines. *See Friedrick*, 842 F.2d at 396, 398 (holding that defendant FBI agent, an Annapolis graduate and a twelve-year veteran of the FBI, who had been given *Miranda* warnings and had immunity from prosecution as a grand jury witness and in internal investigation, could not reasonably be expected to accurately analyze whether questioning pertained to the grand jury proceedings and the internal investigation or to a possible criminal prosecution so as to know whether to claim his privilege against self-incrimination).

{23} We agree with the State that governments have a strong interest in investigating whether their employees have abused the public trust. However, "the state has a choice between either demanding a statement from an employee on job-related matters, in which case it [cannot] use the statements in a criminal prosecution, or prosecuting the employee, in which case it cannot terminate the employee for refusing to give a statement." *Camacho*, 739 F.Supp. at 1514–15. Here the evidence, viewed in the light most favorable to upholding the verdict, shows that the State demanded Defendant give the statements on pain of dismissal if he refused and therefore cannot now use them against him in a criminal prosecution.

{24} Our holding does not prevent government employers in New Mexico from requiring an employee to answer job-related questions or face termination. We simply hold that the employee's statements may not be used in a criminal prosecution of the employee. *In re Grand Jury Subpoenas Dated December 7 and 8*, 40 F.3d at 1102.

**CONCLUSION**

{25} The trial court had sufficient evidence before it to find Defendant's fear that he would lose his job if he did not talk to investigators was subjectively real and objectively reasonable. Accordingly, the trial court correctly concluded his statements were not voluntary and were therefore obtained in violation of his Fifth Amendment privilege against self-incrimination. We af-

firm the court's suppression of the statements.

{26} **IT IS SO ORDERED.**

LYNN PICKARD and M. CHRISTINA ARMIJO, JJ., concur.