This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-39092**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellant,

v.

**MICHAEL V. DIAS,**

      Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Angie K. Schneider, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellant

Liane E. Kerr
Albuquerque, NM

for Appellee

### MEMORANDUM OPINION

**IVES, Judge.**

**{1}**    The district court concluded that law enforcement violated Defendant Michael Dias's constitutional rights in the investigation leading to his arrest and, accordingly, that all evidence obtained thereafter must be suppressed. The State appeals only with respect to the results of a breath test for alcohol. We reverse.

**BACKGROUND**

**{2}** On the morning of February 5, 2019, the Alamogordo Police Department (APD) received witness reports that a police vehicle had jumped a curb and struck a roadside sign and that the driver then fled the scene. Using information from the witnesses, investigating officers identified the suspected vehicle in question as a police vehicle assigned to Defendant, who at the time was an officer with APD.

**{3}** Shortly thereafter, the investigating officers located Defendant's vehicle at the Alamogordo City Hall (City Hall), where Defendant, armed with his duty weapon and in his police training uniform, was attending a safety training class with other APD officers and city employees. Addressing the whole group, the two investigating officers—an APD captain and a sergeant—asked whether anyone had been involved in an accident that morning. Defendant responded that he had hydroplaned that morning on the wet roads, but that he did not believe he had hit anything. Defendant was eventually called outside the meeting room into the hallway to speak with his two APD superiors regarding the incident.

**{4}** Upon speaking with Defendant in the hallway, the sergeant observed that Defendant had bloodshot, watery eyes, and emitted a strong odor of alcohol. Based on this observation, and the information offered by Defendant that he was involved in a hydroplaning incident that morning, the captain took Defendant's duty weapon. Defendant's supervisors told him that he was to accompany them to the White Sands Drug and Alcohol Compliance (WSDAC) facility for a drug and alcohol screening.

**{5}** Defendant testified that he felt he had no choice but to submit to the testing, due to his employment as an APD officer; that the WSDAC testing was part of a "fleet protocol"; and that he would be subject to "automatic termination" if he were to refuse this "command" from his superior officers. There is, however, no indication in the record that either the sergeant or the captain explicitly told Defendant that he would be fired if he did not submit to the testing. It is undisputed that the investigating officers never provided Defendant any statement or warning related to any of his constitutional rights. Finally, the record is silent as to whether Defendant was subject to any form of questioning after he was told that he was to go with his superiors to the WSDAC facility.

**{6}** Defendant's test results from his drug and alcohol screening at WSDAC indicated that he had a blood alcohol content (BAC) of .216 or .217—well above the legal limit to operate a motor vehicle. It is undisputed that, upon learning of these results, Defendant requested a second test, apparently because he doubted the accuracy of the WSDAC testing.[1]

---

1Although Defendant did not testify as to the circumstances of this request, investigating officers testified that Defendant was not asked to take a second test by his employers and that Defendant's request was the only reason that a second test was given. In addition, an APD captain who was present at the station when the second test was administered, testified that, following the WSDAC testing, Defendant "was convinced that he wasn't intoxicated, and he wanted to take a breath test to show the command staff that he was not under the influence." Defendant did not challenge this testimony.

**{7}** The requested second test, which was administered on an Intoxilyzer 8000 machine (IR-8000) at the APD station, likewise indicated that Defendant had a BAC of .17—well above the legal limit—and Defendant was subsequently arrested. The State charged him with misdemeanor aggravated DWI, contrary to NMSA 1978, Section 66-8-102(D)(1) (2016); negligent use of a firearm, contrary to NMSA 1978, Section 30-7-4(A)(2) (1993); and failure to give immediate notice of an accident, contrary to NMSA 1978, Section 66-7-206 (1991, amended 2021).

**{8}** Defendant moved to suppress the results of both BAC tests, as well as all incriminating statements made by Defendant during the investigation leading to his arrest. Following a hearing on the motions, the district court issued an order that largely granted Defendant's motion. The court suppressed three categories of evidence: the initial round of drug and alcohol testing performed at WSDAC; "[a]ny and all incriminating statements made by . . . Defendant starting from the time he was told to go to [WSDAC]" by his APD superiors; and the second round of IR-8000 testing performed at the APD station.

**{9}** The exclusion of the first of these categories—the results from the WSDAC testing—was essentially stipulated by the parties from the outset. The suppression of the second of these categories—Defendant's statements given after being taken to the WSDAC facility—was based on the Fifth Amendment's *Garrity* doctrine. *See Garrity v. New Jersey*, 385 U.S. 493 (1967). As for the third category, the district court's order suggests that the grounds for the exclusion of the IR-8000 test results was related in some way to the aforementioned *Garrity* ruling:

> After being told to go with [the sergeant] to [WSDAC] and providing test specimens without being given *Garrity warnings* and being coerced into waiving his Fifth Amendment right against self-incrimination through the threat of losing his job, Defendant's request to take a breath test on the APD IR[-]8000 Intoxilizer [sic] was a forced-choice not the equivalent of voluntary consent to . . . search[.]"

On appeal, the State's claim of error relates only to the last of these three categories: the suppression of the IR-8000 test results.

## DISCUSSION

**{10}** Before turning to the merits of the State's claim of error on appeal, we pause to discuss the scope of our review. As noted, the State confines its argument solely to the district court's ruling suppressing the results of the IR-8000 testing. In basic terms, the State contends that Defendant freely consented to the second-round breath test at the APD station and, thus, the district court's ruling to the contrary was erroneous. This being so, ordinarily our review would be confined to that ruling alone.

**{11}** However, the nature of the district court's order requires a different approach. As the above-quoted portion of the order indicates, the district court's rationale for

excluding the IR-8000 testing is based—in one way or another—on its rationale for suppressing the statements. As such, to properly review the former, we must necessarily review the latter. We therefore begin by reviewing the district court's *Garrity* ruling regarding Defendant's statements, then turn to the suppression of the IR-8000 test results.

{12} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Paananen*, 2015-NMSC-031, ¶ 10, 357 P.3d 958 (internal quotation marks and citation omitted). We view the district court's factual findings "in a light most favorable to the court's ruling," *State v. Ingram*, 1998-NMCA-177, ¶ 5, 126 N.M. 426, 970 P.2d 1151, deferring to factual findings "if substantial evidence exists to support them." *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. We review "the district court's application of the law de novo." *Id.*

## I. The District Court Erred in Applying the *Garrity* Doctrine to Suppress Defendant's Statements[2]

{13} The district court suppressed Defendant's statements pursuant to *Garrity* and this Court's interpretation and application of *Garrity* in *State v. Chavarria*, 2001-NMCA-095, 131 N.M. 172, 33 P.3d 922. Specifically, the district court concluded that all of Defendant's statements made after he was told to go to the WSDA Compliance Center were inadmissible because "Defendant was coerced into waiving his Fifth Amendment right against self-incrimination through the threat of losing his job. Such statements cannot be used against Defendant in a criminal prosecution."

{14} As this ruling correctly indicates, the *Garrity* doctrine is rooted in the United States Constitution's Fifth Amendment protection against self-incrimination.[3] This protection

> not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

*Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (internal quotation marks and citation omitted).

{15} The *Garrity* doctrine is a specific application of Fifth Amendment principles in the public employment context. Simply put, under *Garrity*, "[p]ublic employees may not be

2The district court denied Defendant's motion with respect to statements made prior to the time he was told to go to WSDAC by his superior officers.

3Although Defendant referenced the New Mexico Constitution in the district court and on appeal, he makes no specific arguments about the self-incrimination protection found in Article II, Section 15 of our state constitution, or how this protection might differ from the federal self-incrimination protection. We therefore "assume without deciding that both constitutions afford equal protection" and analyze the issue under a single standard. *State v. Ochoa*, 2004-NMSC-023, ¶ 6, 135 N.M. 781, 93 P.3d 1286.

required to waive their Fifth Amendment privilege on pain of losing their jobs." *Chavarria*, 2001-NMCA-095, ¶ 12. As a consequence, if a public employee is put in a position where they must choose between exercising their constitutional self-incrimination protection and maintaining their public employment, that employee need not expressly raise their Fifth Amendment rights, because statements in this situation are deemed "coerced." *See Garrity*, 385 U.S. at 500; *see also Salinas v. Texas*, 570 U.S. 178, 185 (2013) (noting that *Garrity* reflects the idea that "a witness need not expressly invoke the privilege where some form of official compulsion denies him a free choice to admit, to deny, or to refuse to answer" (internal quotation marks and citation omitted)). In fashioning this rule, the *Garrity* Court recognized that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." 385 U.S. at 497.

**{16}**    In *Chavarria*, this Court adopted a two-pronged "subjective/objective test" for determining whether a *Garrity* violation occurred. *Chavarria*, 2001-NMCA-095, ¶ 14. To satisfy this test, a public employee must demonstrate (1) that the employee had a subjectively real fear that a loss of employment would result from their exercise of the constitutional right to remain silent; and (2) that this fear was objectively reasonable. *Id.* Although some state action is a "necessary prerequisite" to a finding that the employee's fear of termination was objectively reasonable, a court might find a constitutional violation under *Garrity* even "without an express, direct threat." *Chavarria*, 2001-NMCA-095, ¶ 18. Further, the test requires us to "examine the totality of the circumstances surrounding the statements." *Id.* ¶ 17 (internal quotation marks and citation omitted). The burden is on the State to show that any statements given were voluntary. *See id.* ¶ 18.

**{17}**    Under the first prong of the test, we must determine whether Defendant, "starting from the time he was told to go to [WSDAC]," had a subjectively real fear that he would be terminated from his employment if he elected to exercise his constitutional right to remain silent.

**{18}**    The record does not establish that Defendant had such a fear. Although Defendant testified that his superiors "command[ed]" him to go with them to the testing facility and that he believed that if he refused to go, he would be subject to "automatic termination," *Garrity* does not protect public employees from undertaking all *actions* that are mandated upon a threat of termination. Rather, *Garrity* applies only if a public employee must choose between making self-incriminating *statements* and loss of employment—a particular Fifth Amendment "choice between the rock and the whirlpool." *Garrity*, 385 U.S. at 496 (internal quotation marks and citation omitted). The record is devoid of evidence that Defendant was put into such a position. While the parties seem to agree that there was some degree of employment-related compulsion to perform the initial drug and alcohol testing at the WSDAC facility, after leaving City Hall to go to WSDAC, there is no indication that Defendant was compelled to answer questions or give any statements whatsoever. *See Doe v. United States*, 487 U.S. 201, 210 (1988) ("[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information."). While there

can be no doubt that Defendant was placed in an uncomfortable position upon being "command[ed]" to leave City Hall and submit to drug and alcohol testing, the record does not support a finding that he had a subjectively real fear that he would be terminated from his employment *if he elected to exercise his constitutional right to remain silent*. As such, the first prong of the *Chavarria* subjective/objective test is not met with respect to statements made by Defendant after he left City Hall. *See* 2001-NMCA-095, ¶ 16.

**{19}** We conclude that the district court's *Garrity* ruling with respect to Defendant's statements was erroneous. Having identified this error, we are positioned to analyze the crux of the State's appeal: the admission of the IR-8000 test results.

## II. The District Court Erred by Suppressing the Results of the IR-8000 Test Because Defendant Consented by Requesting the Test

**{20}** As noted above, the district court's rationale for suppressing the results of the IR-8000 test suggests a certain degree of reliance on the *Garrity* ruling. While the exact nature of this reliance is not entirely clear, we believe there are three interpretations of the district court's rationale for suppressing this evidence. Regardless of how the order is interpreted, the district court erred.

**{21}** First, in the absence of a *Garrity* violation, the IR-8000 test results cannot be suppressed due to a fruit-of-the-poisonous tree analysis. That is, if the district court concluded that the IR-8000 test was inadmissible because it would not have occurred "but for" the earlier *Garrity* violation, the ruling is erroneous because, as we have explained, no *Garrity* violation occurred.

**{22}** Turning to the second possible interpretation, if the district court reasoned that a *Garrity* violation applied directly to the IR-8000 test and required suppression of the results, the district court erred. As stated above, *Garrity* is rooted in the Fifth Amendment, and our courts have repeatedly held that "physical evidence, such as breath, blood, fingerprints, etc., is excluded from the scope of [Fifth Amendment] protection." *City of Rio Rancho v. Mazzei*, 2010-NMCA-054, ¶ 25, 148 N.M. 553, 239 P.3d 149. It follows that *Garrity* does not apply to the IR-8000 test results.

**{23}** What remains is the third interpretation of the district court's rationale: a pure Fourth Amendment search analysis, entirely independent of the *Garrity* ruling. *See generally State v. Vargas*, 2017-NMCA-023, ¶ 19, 389 P.3d 1080 ("A blood alcohol test is considered a search of persons, and therefore falls within the ambit of the Fourth Amendment." (alteration, internal quotation marks, and citation omitted)), *aff'd*, 2017-NMSC-029, 404 P.3d 416. The question is whether Defendant validly consented to the breath test. We conclude that Defendant did.

**{24}** Consent is an exception to the warrant requirement, *State v. Leticia T.*, 2014-NMSC-020, ¶ 11, 329 P.3d 636, and the state bears the burden of proving that the warrantless search is justified under the consent exception. *State v. Bond*, 2011-NMCA-

036, ¶ 11, 150 N.M. 451, 261 P.3d 599. In New Mexico, we assess the validity of consent to search under a three-tiered analysis. *See State v. Davis*, 2013-NMSC-028, ¶ 14, 304 P.3d 10. Under this test, "(1) there must be clear and positive testimony that the consent was specific and unequivocal; (2) the consent must be given without duress or coercion; and (3) the first two factors are to be viewed in light of the presumption that disfavors the waiver of constitutional rights." *Id.* (internal quotation marks and citation omitted).

**{25}** For the first tier, the district court found that Defendant's request to have the IR-8000 test administered was specific and unequivocal. The district court's order states that "after being taken to [WSDAC] and providing samples for drug and alcohol testing, Defendant wanted to show he was not intoxicated, so he requested taking an IR[-]8000 . . . test." This finding—supported by the uncontradicted testimony of the investigating officers—demonstrates that Defendant's consent was clear and unequivocal.

**{26}** As for the second tier, however, the district court found that the consent given by Defendant was "not the equivalent of valid consent." Although the order does not say so explicitly, it appears that the district court believed the consent was not voluntary because it was the product of coercion. This finding of coercion seems to have been based on a general atmosphere of coerciveness that undergirded its erroneous *Garrity* ruling. The district court wrote

> After being told to go with [the sergeant] to [WSDAC] and providing test specimens without being given *Garrity warnings* and being coerced into waiving his Fifth Amendment right against self-incrimination through the threat of losing his job, Defendant's request to take a breath test on the APD IR[-]8000 Intoxilizer [sic] was a forced-choice not the equivalent of voluntary consent to . . . search.

Although the district court ultimately stated that its lack-of-consent finding was based on a "totality of the circumstances," this "forced-choice" atmospheric coercion—which it erroneously concluded amounted to a *Garrity* violation—is the sole basis on which the court found "duress or coercion" for the purpose of the second tier of the consent analysis. *See Davis*, 2013-NMSC-028, ¶ 14.

**{27}** Because we do not believe that such coercion—on its own—amounts to the type of "duress or coercion" that invalidates consent, we hold that Defendant's consent was valid under the second tier of the test and reverse the district court's suppression of the IR-8000 test results. "Coercion involves police overreaching that overcomes the will of the defendant." *State v. Chapman*, 1999-NMCA-106, ¶ 21, 127 N.M. 721, 986 P.2d 1122. Stated examples of such overreaching, though by no means exhaustive, include conduct like "the use of force, brandishing of weapons, threat of violence or arrest, lengthy and abusive questioning, deprivation of food or water and promises of leniency in exchange for consent." *Davis*, 2013-NMSC-028, ¶ 23. In this case, the record includes no evidence of, or even suggestions of, physical force, questioning, unfulfilled promises, or other forms of abuse or trickery. Moreover, here the consent to search was

given in the form of an unprovoked affirmative request *by Defendant*. Generally, consent to search is given in response to a request *by law enforcement*. We see no basis for concluding that Defendant—who asked to have his breath tested without any demand, request, or even suggestion by any state actor—was unconstitutionally coerced. Unsurprisingly, Defendant has not cited any authority that would support such a conclusion, and we have found none. Finally, we decline to hold that a mere fear of the loss of one's public employment, without more, is sufficient to support a finding of coerciveness that vitiates an otherwise consensual search. Such a holding would, in effect, extend the scope of *Garrity* well beyond the confines of the Fifth Amendment's protection.

**{28}** Even heeding the "presumption that disfavors the waiver of constitutional rights," *Davis*, 2013-NMSC-028, ¶ 14 (internal quotation marks and citation omitted), we conclude that Defendant validly consented to be searched when he requested the IR-8000 test. By suppressing the results of that test, the district court erred.

**CONCLUSION**

**{29}** We reverse the suppression of the IR-8000 test results.

**{30}** **IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**SHAMMARA H. HENDERSON, Judge**